Leo John Dinoffria et al., Plaintiffs, v. International Brotherhood of Teamsters and Chauffeurs Local Union No. 179, American Federation of Labor et al., Defendants.

Gen. No. 10,117.

Opinion filed March 5, 1947. Rehearing denied May 7, 1947. Released for publication May 8, 1947.

RAYMOND J. HARVEY, of Joliet, and SAMUEL SAXON, of Plainfield, for appellants.

FRANCIS A. DUNN, of Joliet, for appellees.

MR. JUSTICE BRISTOW delivered the opinion of the court.

This is an appeal by plaintiffs Leo John Dinoffria, Frances Dinoffria, John Clementi, and Mary Clementi, from a decree entered by the circuit court of Will county denying both temporary and permanent injunctions and claims for damages against the defendant labor union and its secretary treasurer, Virgil Floyd.

The salient facts appearing from the pleadings and evidence adduced before the circuit court indicate that plaintiffs were self employed owners and operators of gasoline service stations in Joliet, Illinois, and that they hired no employees.

Plaintiffs Dinoffria leased their station from the Standard Oil Company (Indiana) and agreed to carry their products. Although they did not at present have a contract with the company, they had had one in the past, and the record shows a long series of dealings. The current lease was executed by Frances Dinoffria while her husband was overseas, and he resumed the operation of the station on December 21, 1945.

Plaintiffs Clementi owned the property upon which their station was situated, and had a written agreement with the Texas Company to sell its products. They had been in business for over 14 years.

On January 25, 1946 Mrs. Dinoffria was solicited and asked to join the defendant union. She replied, "What for? We don't have to belong." Whereupon

the union agent stated, "Oh yes, you do!" and left the premises.

It appears further that at the time plaintiffs Dinoffria were solicited, they were required to sign a contract as an integral part of the union membership, which provided that employers of gasoline stations agree to employ only union employees, pay specified wages, remain open certain hours, and adhere to prescribed business practices which barred the use of premiums to stimulate sales.

Later that same day plaintiffs Dinoffria placed an order for gasoline with the Standard Oil Company. The clerk, Ray Ahlberg, admitted receiving the order and passing it on to the driver, James E. Poole, who had been making deliveries to the Dinoffria station for the past eight to ten years. The driver, who was a member of defendant union, testified he knew that plaintiffs ordered gasoline on January 25 and subsequent thereto, and explained that those orders were not filled for the reason that on the aforementioned date one of the union representatives had informed him not to make deliveries to the plaintiffs Dinoffria.

This admission was corroborated and supplemented by the testimony of F. H. Beshoor, distribution supervisor for the Standard Oil Company in the local branch at Joliet. The latter stated that he also knew of plaintiffs' order on January 25, and that no orders were delivered to the Dinoffrias because instructions were given by the business agent of the union to the Standard Oil Company not to make such deliveries. He admitted further that, although he was the supervisor of these drivers, he did nothing to override the instruction of the union.

The record further shows from the admissions and statements of Virgil Floyd, the secretary treasurer, and business representative of the union, that the union could fine a member for failing to carry out instructions. This witness testified that although he

did not think there were any provisions in the constitution and by-laws of the union with reference to punishing a member who refused or refrained from complying with union instructions, nevertheless "the executive board takes care of all enforcements and has the same power as a civil court," and could try anyone brought up for charges. He admitted further that the only dispute the defendant union had with the plaintiffs Dinoffria was that they refused to join the union.

Plaintiffs Dinoffria ran out of gasoline the following day, January 26, and were forced to close their station from which they had been earning a profit of approximately $20 to $25 per day.

The evidence with reference to the plaintiffs Clementi was submitted by stipulation, and is substantially the same as that offered by the Dinoffrias. On January 28, 1946 Mr. Clementi was approached and asked to join the union and sign the aforementioned contract as part of that membership. He refused to join, and thereafter his orders for gasoline, placed with the Texas Company pursuant to his written contract with that corporation, were not filled, since the driver for the Texas Company and sundry other drivers were members of the defendant union and were also instructed not to make deliveries to the Clementi station because the owner refused to join the union. As a result of defendant's conduct plaintiffs Clementi were forced to close their station, which had been earning a profit of approximately $40 per week.

In their amended complaint upon which this case was tried plaintiffs Dinoffria and Clementi pray judgment against the defendant union and its treasurer in the sum of $10,000 for damages caused by the wrongful stoppage of deliveries of gasoline to plaintiffs, and also seek to enjoin defendants both temporarily and permanently from interfering with or stopping their businesses—more particularly from interfering with

the deliveries of gasoline and petroleum products to plaintiffs' stations.

The trial court denied the injunction and the claim for damages for reasons set forth in a written opinion, and from this decree plaintiffs have appealed.

The primary issue confronting this Appellate Court is whether the conduct of the defendant union in instructing its members not to make deliveries of gasoline to the plaintiffs, who are self employers and hire no employees, on the sole ground that plaintiffs refused to join the union, is unlawful and should be restrained by the injunctive process and defendants be made to pay damages for the loss occasioned by their conduct.

From the decisions of the Illinois Supreme Court and those of the Supreme Court of the United States it is apparent that the scope of permissible conduct by workingmen acting in concert to improve their economic position has steadily expanded. It would serve no useful purpose herein to review the cases and reiterate the ratio decidendi of each one, inasmuch as the Illinois Supreme Court has done so in several recent decisions. *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago, No. 753*, 371 Ill. 377. This court shall direct its inquiry, therefore, to an analysis of the legality of the purpose of defendant's conduct and of the means employed to effectuate this purpose.

The Illinois Supreme Court and the Supreme Court of the United States have held that the constitutional guarantee of freedom of speech justifies and insures to working men the right of peaceful picketing as a means of communicating their complaint "where the subject matter of dispute contains elements of common interest." *Swing v. American Federation of Labor*, 312 U. S. 321; *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago, Local 753*, 312 U. S. 287; *Thornhill v. Alabama*, 310 U. S. 88; *Ellingsen v. Milk Wagon Drivers' Union Local No. 753*, 377

Ill. 76. This constitutional right, moreover, will justify peaceful picketing even where there is no employer employee relationship because of the dependence of economic interest of all engaged in the same industry.

In no case, however, has the court sanctioned, or been called upon to approve peaceful picketing or boycotting or other conduct of a labor union where it has been directed against a self employer who hires no employees, as in the instant case.

Under these circumstances, as in other cases involving concerted action by workingmen, the court, in determining whether injunctive relief shall be granted, must impartially balance the constitutional rights of the workingmen to improve their position through the medium of speech, and the constitutional right of the owner to fulfill his contract, conduct his business and protect his property. Section 814, Restatement of the Law of Torts; *Ellingsen* case, *supra,* at p. 83.

In the case at bar the sole dispute the defendant union had with the plaintiffs was that plaintiffs refused to join the union, and, as a concomitant part thereof, to sign the contract regulating their hours of work and the manner in which they conducted their businesses.

It is difficult to perceive how the defendant teamsters and chauffeurs union could improve their working conditions by compelling plaintiffs, who were self employed owners and operators of service stations and had no employees, to become members of their union.

There is no contention made by defendant that plaintiffs were failing to meet the standards of wages and employment fixed by unions and thereby jeopardizing the rights of workingmen in the same industry, for the plaintiffs had no employees to whom they could pay wages.

Nor is it contended that plaintiffs were unfairly competing with the teamsters and chauffeurs union or with their employers, the Standard Oil Company and the Texas Company, as in the *Meadowmoor* and *Ellingsen* cases, *supra,* where it was urged that the method employed in the distribution of milk products constituted unfair competition for the union's employer and therefore was detrimental to the working conditions of members of the defendant union.

Nor is there an allegation that plaintiffs were conducting their business in a manner detrimental to the aims of the union. It is impossible for this court to perceive just how the defendant union was being harmed by plaintiffs' refusal to join defendant's membership.

The sole conceivable effect of plaintiffs' membership in the union would be to permit the union, by virtue of the aforementioned contract, to regulate the hours during which plaintiffs kept their stations open, and to prohibit them from using premiums to stimulate sales.

While courts have recognized that employees may combine for the purpose of obtaining lawful benefits for themselves, and have held that where the primary purpose of the combination is to further the interests of the organization and improve the conditions of its members, whatever injury may follow is merely incidental, nevertheless the law gives no sanction to combinations which have for their immediate purpose the injury of another. *Fenske Bros., Inc. v. Upholsterer's International Union of North America,* 358 Ill. 239, cited and approved in the *Meadowmoor* case, *supra.*

Inasmuch as the only discernible purpose of defendant in compelling plaintiffs to join the union was to regulate plaintiffs' service stations and thereby destroy fair competition—the life blood of industry—defendant's conduct in thus interfering with the operation of plaintiffs' businesses cannot be justified as

being in the interests and for the economic advancement of the members of the defendant union. Such conduct cannot be deemed lawful and protected by the constitutional guarantee of free speech.

The inevitability of this conclusion is readily apparent when the implications of defendant's conduct are perceived. Sanctioning defendant's acts would authorize a union to refuse to deal with or deliver essential supplies to self owned and operated groceries, drug stores, or other self operated business, and thereby destroy such business merely because the owners refused to join the union and sign an agreement to operate their respective enterprises in a manner prescribed by the union in the agreement. The monopolistic features of such conduct are too obvious to require further comment.

Even if this court were to conclude, however, that the defendants had a legitimate objective in seeking plaintiffs' membership in their union, the next query would be whether the means employed by the defendant union fell within the area of permissible conduct defined by the courts.

Courts have invariably enjoined violence, or even peaceful picketing when it is enmeshed in the context of violence. *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago, Local 753,* 312 U. S. 287. Moreover, even where there was no violence in the sense of physical assault or destruction of property, statements and actions of a threatening nature, which amounted to attempts to intimidate, will also be enjoined, *Ellingsen v. Milk Wagon Drivers' Union, Local No. 753,* 377 Ill. 76, 86, and such threats and intimidation have been implied from conduct and demeanor as well as from spoken words.

Courts have likewise enjoined the use of the secondary boycott, which is a combination to coerce customers, actual or prospective, to discontinue dealings, or withhold their patronage, through fear of loss or damage to themselves. *Meadowmoor* case, *supra,*

371 Ill. 377 at p. 381; *Anderson & Lind Mfg. Co. v. Carpenters' Dist. Council*, 308 Ill. 488; *Duplex Printing Press Co. v. Deering*, 254 U. S. 443; *Auburn Draying Co. v. Wardell*, 227 N. Y. 1. Such coercion has been held to exist where the union has instilled fear of loss or injury to business unless one submits to demands, as well as where there is fear of violence to the person. *Anderson & Lind Mfg. Co.* case, *supra.*

Courts have, however, sanctioned peaceful picketing where it is done to promote a legitimate purpose, as a proper exercise of the right of free speech. *Swing* case, *supra; Ellingsen* case, *supra;* and *Meadowmoor* case, *supra.*

The case at bar, however, does not involve peaceful picketing. On the contrary, the evidence indicates that defendants coerced plaintiffs directly and by the use of a completely effective boycott which destroyed plaintiffs' businesses with one blow.

Inasmuch, however, as defendant contends that the evidence of coercive action is insufficient to warrant the issuance of an injunction, this court will re-examine the evidence and determine, in the light of the aforementioned decisions, whether defendant's conduct was enjoinable.

When the union agents solicited the plaintiff Frances Dinoffria to join its membership and she replied that they did not have to join the union, the agent stated, "Oh yes, you do!" and immediately left the premises. The legitimate implication of the remark is that it was intended as a threat, for threats and intimidation are implied from conduct and demeanor as well as from words. This implied threat, moreover, was carried out when the business agent of the union immediately thereafter instructed those members who were drivers for the Standard Oil Company, and particularly James Poole, who had been making deliveries to plaintiffs' station, to stop all deliveries there, knowing that the effect of such conduct would be the immediate annihilation of plaintiffs' business, since

plaintiffs operated a Standard Oil station and could sell only Standard Oil products. Yet defendant refers to this "strangulation" as peaceful persuasion.

With reference to the coercion exercised by the defendant union upon its members to effectuate the boycott the record shows, from the testimony of the secretary treasurer of the union, that it could fine a member for failing to carry out the instructions to stop deliveries to the plaintiffs, and also that the executive board had the "power of a civil court" to enforce its instruction and to punish members who disobeyed them.

The court takes cognizance, furthermore, of that part of the record where the defendant barred the introduction in evidence of ordinarily admissible statements against interest made by the union driver, Poole, to the plaintiff Leo John Dinoffria as to what would happen to him if he failed to comply with union instructions.

Evidence pertaining to strike threats or other retaliatory action made by the union to the Standard Oil Company if it insisted upon making deliveries to the plaintiffs Dinoffria was held inadmissible. However, the distribution supervisor for the Joliet branch office, F. H. Beshoor, did admit in his testimony that although he supervised the drivers he did nothing to override the instructions of the union even though he knew of the prior dealings between his company and the plaintiffs, and of their unfilled orders. He further testified that the company had no dispute with the plaintiffs Dinoffria.

The stipulation containing the facts with reference to the plaintiffs Clementi stated that the defendant union caused the Texas Company not merely to terminate a series of dealings, but to break an existing contract between it and the plaintiffs Clementi.

The existence of coercion by the union upon the two oil companies is fairly apparent from their conduct, in one case in immediately ceasing dealings

with a lessee and customer of long standing, and in the other case in deliberately breaking a contract with a customer, where they had no dispute with such persons and acted for the sole reason that the union instructed them to do so.

Clearly this interference with plaintiffs' businesses by the defendant union was tantamount to a secondary boycott, condemned and enjoined by the courts in an established line of cases.

In *Anderson & Lind Mfg. Co. v. Carpenters' Dist. Council*, 308 Ill. 488, the court stated, "No person has a right to make war on another and to compel others to break off business relations with him to his injury. (*O'Brien v. People*, 216 Ill. 354; *Wilson v. Hey*, 232 id. 389; *Barnes & Co. v. Typographical Union*, id. 424.)"

This interpretation of the law was reiterated in the *Meadowmoor* case, *supra,* where the Illinois Supreme Court stated, at p. 381:

"It is likewise illegal to persuade or coerce persons dealing with one in business into discontinuing such dealings by threats of injury to customers by means commonly called a secondary boycott. (citations.)"

It is submitted, moreover, that it is even more injurious and hence more reprehensible to cut off the sole source of supply of a business and thereby utterly destroy it, as the defendant union intended, and did so, in the instant case, than to dissuade a single or even a few customers from dealing with a person, which was condemned and enjoined in the *Meadowmoor* and *Ellingsen* cases, *supra.*

The court below relied upon the case of *2063 Lawrence Ave. Bldg. Corp. v. Van Heck*, 377 Ill. 37, where the court denied an injunction on the ground that the defendants therein did not engage in a secondary boycott involving elements of coercion by threats, intimidation or violence. The facts in that case, however, are clearly distinguishable, and the decision is

in no way pertinent to the case at bar. There members of the janitor's union were picketing an apartment building, claiming that the owner, by hiring a non-union janitor, was unfair to organized labor, and the court found that the conduct of the union merely involved peaceful picketing within the constitutional guarantee of free speech, and that if others desisted from dealing with the owner it was as a result of merely peaceful persuasion.

The opinion of the circuit court herein also relies upon and quotes generously from the aforementioned *Meadowmoor* case. It is not clear to this court how anything contained therein sanctions the conduct of the defendant union in the instant case, and that applies to the opinions filed by the Illinois Supreme Court and the one by Justice FRANKFURTER of the Supreme Court of the United States. On the contrary, in the discussion of the decisions, the Illinois Supreme Court states, at p. 387:

"It has been held repeatedly that an action will lie for a malicious interference with the disposal of plaintiff's labor or capital, or for interfering with lawful contracts, or from bringing about or engaging in a secondary boycott."

All that case held was that all picketing, peaceful and otherwise, would be enjoined where it was enmeshed in a context of violence. The court pointed out, moreover, that the authorities make no distinction in the right to an injunction in cases involving a secondary boycott and other illegal acts. Therefore, irrespective of whether defendant's conduct is labeled as a "secondary boycott," or as an unlawful interference with plaintiffs' constitutional right to do business, it does not fall within the area of conduct sanctioned by the courts, for "attempts to coerce by intimidation are not peaceful picketing; nor do they reasonably present the workingman's side of the controversy." *Ellingsen* case, *supra,* at p. 86.

■ It is, therefore, the considered judgment of this court that defendant's conduct was motivated by the illegal purpose of coercing self employed owners and operators of gasoline stations who hired no employees to join the union and sign an agreement, the net effect of which would only stifle competition, and in no way improve the conditions of labor of its members, and that defendant exercised unlawful means to effectuate this purpose.

The defendant union, therefore, should be enjoined both temporarily and permanently from interfering with the deliveries of gasoline and other petroleum products to plaintiffs' places of business, and from otherwise interfering with the said businesses.

■ Equity having taken jurisdiction of the cause will retain it for all purposes to do complete justice between the parties (*Fenske Bros., Inc. v. Upholsterers International Union of North America,* 358 Ill. 239, 260), and therefore this court will consider plaintiffs' claim for damages against the defendant union and Virgil Floyd, secretary treasurer of the union for the loss occasioned by defendant's wrongful stoppage of delivery of gasoline to the plaintiffs Dinoffria and Clementi.

■ It has been repeatedly held that it is an actionable wrong to directly or indirectly interfere with or disturb another in his business without lawful cause or justification for the sake of compelling him to do some act which in his own judgment his own interest does not require. (*Carlson v. Carpenter Contractors' Ass'n of Chicago,* 305 Ill. 331; *Doremus v. Hennessy,* 176 Ill. 608; *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago No. 753,* 371 Ill. 377, and cases cited therein.)

■ In the instant case this court has concluded that there was no justification for defendant's boycott and other unlawful interferences with plaintiffs' right to "exercise and enjoy the fruits and ad-

vantages of his own enterprise, industry and skill and work.'' (*Doremus v. Hennessy, supra.*) Therefore, plaintiffs are entitled to damages, the amount of which shall be set by the trial court in accordance with evidence submitted thereon. Inasmuch as all parties to such a combination are liable for all acts illegally done in pursuance of such conspiracy, and for the consequent loss, whether they were active participants or not (*Doremus v. Hennessy*), the defendant, Virgil Floyd as the secretary treasurer of the defendant union is legally liable for all unlawful acts perpetrated by the union.

The decree entered herein, therefore, should be and is hereby reversed and the cause remanded with directions to enter a decree and proceed in accordance with the views expressed herein.

*Reversed and remanded.*