313 P.2d 759

Don A. BALDWIN, individually and as Secretary-Treasurer and Business Agent of the Hotel & Restaurant Employees & Bartenders Union Local No. 631; Hotel & Restaurant Employees and Bartenders Union Local No. 631; Hotel & Restaurant Employees and Bartenders International Union, A.F.L.; George DeTalente, individually and as President of said Local 631; John Does I to 1000, agents, members and servants of aforesaid Bartenders Unions, Appellants,

v.

ARIZONA FLAME RESTAURANT, Inc., a corporation; Western Village Management Corporation, a corporation; Clyde R. Garland and Gale Garland, a copartnership, d/b/a Central Dryv Inn; John P. Schroeder and Jean B. Schroeder, copartners, d/b/a North Town Drive Inn; Milton's Skylark Cafe, Inc., a corporation; Carl J. Lockett, d/b/a Carl's Restaurant; Charles Stow and Hazel Stow, copartners, d/b/a Arizona Hotel Coffee Shops; S. W. Hubbard and Merry E. Hubbard, copartners, d/b/a Hubbard's 307; Sam C. Colachis, Sr., Sam C. Colachis, Jr., James W. Colachis, Christ Fontinos, and Nick Cuimanes, a copartnership, d/b/a Saratoga Cafe; Donofrio's Confectionery, Inc., a corporation; George Phacas, d/b/a Colonial Cafe; A. S. Miller, Sr., A. S. Miller, Jr. and Bruce M. Miller, copartners, d/b/a Miller's Cafeteria; Robert E. Gosnell, d/b/a Green Gables; Douglas Lee and Rose Lee, copartners, d/b/a Lee's Restaurant; L. J. Newton, d/b/a Newton's Prime Rib; Greenway Coffee Shop, Palomine Coffee Shop, Flamingo Coffee Shop and Cocktail Lounge, Jays and Brass Rail; Joe Hunt, Chet W. Johns, Joseph F. Martori and Horace E. Comer, copartners, d/b/a Joe Hunt's Steak House; and Jack Malcoff and Sol Malcoff, copartners, d/b/a Malcoff's, Plaintiffs-Appellees,

Gene Doyle, d/b/a Circle M Cafe and Killarney (Smorgasbord); Dale James, d/b/a The Silver Spur; Ann Abbott, d/b/a Shed 13, Added Plaintiffs-Appellees, Lillie Lann, Louise Packer, Samuel Southern, Frances Holland and Melba Farthing, Intervening Plaintiffs-Appellees.

No. 6020.

Supreme Court of Arizona.
June 29, 1957.

Parker & Muecke, Phoenix, for appellants.

Jennings, Strouss, Salmon & Trask, Irving A Jennings, Clarence J. Duncan, John E. Madden, and Albert B. Spector, Phoenix, for appellees.

Ira Schneier, Tucson, Herbert B. Finn and Stephen S. Gorey, Phoenix, amici curiae.

LA PRADE, Justice.

This is an appeal from a decree of interlocutory injunction enjoining defendant, union from picketing of the establishments of the plaintiffs. The appellant, The Hotel and Restaurant Employees' and Bartenders' Union, Local No. 631, one of the defendants below, will hereinafter be referred to as the defendant union; the appellees-plaintiffs will be referred to as the restaurant plaintiffs or intervening plaintiffs, whichever is appropriate.

The essential facts follow: On February 1, 1954, a three-year collective bargaining contract between the defendant union and the Arizona Restaurant Association, of which all restaurant plaintiffs except the added restaurant plaintiffs were members, expired, and was extended by mutual agreement until February 28, 1954. Prior to the expiration date and pursuant to this agreement, negotiations were initiated in an attempt to work out a new contract. The parties, after various proposals and counterproposals extending past the final expiration date, were unable to resolve their differences through such negotiations

On March 1, 1954, the majority of the membership of the defendant union voted to strike against all of the restuarant plaintiffs who refused to execute a proposed collective bargaining contract (plaintiffs' exhibit B) which contained, among other provisions, a "one owner" clause, "agency-shop" clause, "joint examining board" clause, and "hiring hall" clause. Picket lines were established immediately thereafter. On March 26, 1954, the restaurant plaintiffs filed a complaint seeking to enjoin defendant union's picketing against their establishments, on the ground that such was being conducted to force execution of an unlawful collective bargaining contract (exhibit B). The trial court granted the temporary restraining order prayed for. Defendant union then moved to quash the restraining order and at that time irrevocably renounced as collective bargaining objectives, without conceding their illegality, the "one owner" and "agency-shop" provisions of the proposed contract, which the court had indicated to be unlawful objectives, and amended the proposed agreement accordingly. The amended contract is referred to as defendant's exhibit 9. The trial court, upon such renunciation, modified its temporary restraining order to permit specified peaceful picketing. At this point the court permitted certain other restaurant owners, who had subsequent to commencement of this action become the targets of defendant union's picketing, to be added as plaintiffs. Subsequent to the date the strike was called each of the restaurant plaintiffs had replaced some of the strikers with non-union employees, and certain members of this replacement group were permitted to intervene as class action representatives (intervening plaintiffs). The restaurant

plaintiffs then filed a verified petition for reinstatement of the terms of the original restraining order on the grounds that the vacancies caused by the strikers had been filled; that business had returned to normal; and that there in fact no longer existed a bona fide labor dispute between the management of any restaurant plaintiff and a majority of its employees.

The trial court, after conducting a hearing, ultimately made findings of fact and conclusions of law, and issued an interlocutory injunction reinstating the original restraining order prohibiting all picketing of the restaurant plaintiffs' establishments. The findings of fact were to the effect that the purpose of defendant union's picketing was as to the restaurant plaintiffs, except the added restaurant plaintiffs, conducted to force the execution of the proposed collective bargaining contract referred to as exhibit B; and as to the added plaintiffs to force the execution of the proposed contract referred to as exhibit 9. It furthermore specifically found

"That said picketing * * * was * * * to cause the discharge of persons employed by plaintiffs and cause persons to be denied employment because of non-membership in a labor organization by inducing other persons to refuse to work with such persons; and to compel or attempt to compel persons employed by said plaintiffs to strike against their will and to leave their employment by threatened interference with their property."

Based upon its findings of fact the court arrived at a conclusion of law to the effect that the picketing of the defendant union was conducted for an unlawful purpose and illegal under the provisions of sections 56–1301 to 56–1308, 1952 Supp. and sections 56–1309 to 56–1311, 1954 Supp. A.C.A.1939 (section 23–1301 et seq., A.R.S.), and that, therefore, the restaurant plaintiffs and intervening plaintiffs were entitled to an injunction against its continuance. The trial court in addition handed down a memorandum opinion which, upon motion of defendant union, was incorporated as an amendment to the findings of fact and conclusions of law. In effect this opinion declared that the "one owner", "agency-shop", "joint examining board" and "hiring hall" clauses constitute illegal collective bargaining objectives as being in conflict with the laws of this state; that the union had, therefore, struck to achieve unlawful ends; that regardless of the effect renunciation of the four contract clauses may have had, the restaurant plaintiffs, having replaced the strikers, there no longer existed a bona fide dispute between any of the restaurant plaintiffs and a majority of their employees, respectively; and that, therefore, further picketing was violative of section 56–1310 (anti-picketing statute), 1954 Supp. A.C.A.1939 (section 23–1322, A.R.S.) and enjoinable. The trial court disregarded

defendant union's tender to irrevocably renounce the "hiring hall" and "joint examining board" provisions of the proposed collective bargaining contract (exhibit 9), which the court had since the initial renunciation indicated to be unlawful; denied the defendant union's objections to the findings of fact and conclusions of law; and refused to again modify its decree to permit peaceful picketing. From the findings of fact, conclusions of law, and decree of interlocutory injunction, the defendant union has taken this appeal. In this connection the defendant union has submitted fifty-one assignments of error for our consideration.

The primary issue presented is whether the trial court was justified under our law to issue an interlocutory injunction enjoining the defendant union from peaceful picketing of plaintiffs' establishments.

The memo opinion written by the trial court reflects that the interlocutory decree appealed from is primarily based upon a conclusion that the picketing of the defendant union was in violation of section 56–1310, supra. It is reasoned that after the union employees struck they were replaced with non-union employees (intervening plaintiffs) to the extent that there no longer existed a bona fide labor dispute between the restaurant plaintiffs' establishments and a majority of their present complement of employees, respectively; and that the picketing, therefore, comes within the prohibition of section 56–1310, supra, and is enjoinable. The defendant union contends in opposition that section 56–1310, supra, constitutes an unconstitutional abridgement of the right of free speech insured under Amendment XIV of the United States Constitution. With this contention of the defendant union we are in agreement.

Section 56–1310, supra, provides that:

"It shall be unlawful for any labor organization to picket any establishment unless there exists between the the employer and majority of employees of such establishment a bona fide dispute regarding wages or working conditions."

██ It is well settled that where peaceful picketing is conducted for a lawful purpose it cannot be prohibited or enjoined. A general prohibition on peaceful picketing violates Amendment XIV of the United States Constitution, which prohibits state action violative of the guarantees insured under the First Amendment protecting freedom of speech, press and assembly. Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855; Culinary Workers and Bartenders, etc. v. Busy Bee Cafe, 57 Ariz. 514, 115 P.2d 246; American Federation of Labor v. American Sash & Door Co., 67 Ariz. 20, 189 P.2d 912. It is an equally well-established proposition of law that picketing, even when peace-

ful can be enjoined when such is conducted for an unlawful purpose. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Building Service Employees International Union v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; Local Union No. 10, etc. v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946. Thus, a court can properly enjoin peaceful picketing the purposes of which include the accomplishment of objectives which constitute violations of state laws. But a state policy which has the effect of restraining peaceful picketing must aim specifically at the evils within the allowable area of state control and not sweep within its ambit other activities which in ordinary circumstances constitute an exercise of freedom of speech or press. Thornhill v. State of Alabama, supra.

▇▇ The plain wording of section 56–1310, supra, requires as a condition precedent to a labor organization picketing the establishment of any employer that there exists a bona fide dispute between such employer and a majority of his employees. It, therefore, effectively provides that under all circumstances, and regardless of purpose, a union having less than a majority is prohibited from all peaceful picketing. Such clearly on its face constitutes a general prohibition against peaceful picketing in violation of the United States Constitution, as such has been interpreted by the highest court in the land.

The decisions of that court interpretive of the Constitution are binding upon us regardless of personal views as to their soundness which we may entertain. In American Federation of Labor v. Bain, 165 Or. 183, 106 P.2d 544, 555, 130 A.L.R. 1278, where statutes similar in effect to section 56–1310, supra, were under attack, the Oregon court, after a learned discussion of the law, struck down the provisions as unconstitutional, stating that they saw

"* * * no escape from the conclusion that the denial of such a right to the members of a minority is no less an unconstitutional abridgement of the right [of free speech] simply because it is saved to the majority."

The constitutionality of a similar provision was successfully challenged in International Union of Operating Engineers, etc. v. Cox, 148 Tex. 42, 219 S.W.2d 787, and we are aware of no decision now effective which upholds the constitutionality of such a statute. We, therefore, have no hesitancy in declaring section 56–1310, supra, to be violative of Amendment XIV of the Constitution of the United States. This statute, being unconstitutional and void, cannot form a basis upon which the interlocutory injunction here assailed can be legally grounded.

▇▇ Without at this juncture ruling on their legality as collective bargaining objectives under existing law, we next turn

our consideration to the four controversial contract clauses; "agency-shop" clause, "one owner" clause, "hiring hall" clause, and "joint examining board" clause. We direct our consideration to these contract provisions at this point with the object of resolving only whether they, when subsequently abandoned, could form the basis upon which the trial court could properly predicate the decree of interlocutory injunction which forms the basis for this appeal. We are of the opinion that they could not.

We are satisfied that the evidence justifies the trial court's finding that the initial objective of the union in declaring a strike was to force the execution of a collective bargaining contract (Exhibit B) which contained all four of the clauses above set forth. We must, therefore, assume that such clauses were included among initial objectives sought to be achieved by strike and picket. At this point it is well to reiterate, however, that after the trial court indicated the four clauses to be unlawful collective bargaining objectives, the defendants had either irrevocably renounced or offered to renounce each of these clauses as objects of their continued peaceful picketing. In 43 C.J. S. Injunctions § 196 b (3), p. 906, it is stated that

"As a general rule an injunction will be denied where the defendant denies

intent to continue the acts sought to be enjoined and there is nothing to show the falsity of his denial."

Specifically, we find the rule to be that where the purposes of peaceful picketing include objectives deemed unlawful, an injunction enjoining such picketing cannot properly be continued after the unlawful purposes, either as a matter of fact or law, cease to be the objectives thereof. Gruet Motor Car Co. v. Briner, Mo.1950, 229 S.W.2d 259; Pappas v. Local Joint Executive Board, 374 Pa. 34, 96 A.2d 915. It is, therefore, evident that, assuming the four contract clauses are unlawful collective bargaining objectives, an injunction enjoining peaceful picketing, the object of which is to achieve them, could be based upon such clauses only so long as its objectives included any of them. Obviously, if these clauses were irrevocably renounced, there would remain no danger that any of them would form the basis for further demands of the defendant union in this particular case. Such revocation would effectively amount to an irrevocable change of position from which the defendant union could not depart without court authorization. We, therefore, conclude that once the defendant union officially, irrevocably and unconditionally renounced these clauses, they, as a matter of law, could no longer have been properly regarded as objects of its peaceful picketing. Consistent with this analysis we find that the trial

court in the instant case was obligated to accept the tendered irrevocable renunciation of each of these clauses, and should have modified its order accordingly. It accepted as to the "agency-shop" and "one owner" clauses but declined with respect to the "hiring hall" and "joint examining board" provisions. It erred in so declining. It is, therefore, our conclusion that none of the four clauses is properly available upon which to predicate the interlocutory decree.

Plaintiffs argue that notwithstanding the allegedly illegal contract demands of the union, and quite apart from its purported subsequent "renouncement" of the allegedly illegal clauses contained therein, it was a goal of the defendant's picketing to the very end to force plaintiffs to agree to discharge the replacements (intervening plaintiffs) at their respective establishments and to reinstate the union strikers in their positions; that such object was unlawful as being in conflict with the right-to-work amendment of the Constitution of this state; and that being an illegal object it in and of itself constitutes a sufficient basis for the enjoinment of defendant's continued picketing. Indeed, the learned trial court found as a fact that one of the objectives of defendant's picketing was " * * * to cause the discharge of persons employed by plaintiffs. * * * " Our right-to-work amendment, A.R.S. Arizona Constitution, Article XXV

(section 56–1302, A.C.A. 1952 Supp.; section 23–1302, A.R.S.), reads as follows:

"No person shall be denied the opportunity to obtain or retain employment because of nonmembership in a labor organization, nor shall the state or any subdivision thereof, or any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of nonmembership in a labor organization."

It is clear that parties are prohibited under this amendment from entering into an agreement, written or oral, which would have the effect of excluding any person from employment or continuation of employment for non-membership in a labor organization. It follows that where peaceful picketing is conducted for the specific purpose of forcing an employer to agree to replace his non-union help with union members who stand as mere strangers at his gate, such runs afoul with the clear mandate of the right-to-work amendment above set forth. Hanson v. International Union of Operating Eng., La.App.1955, 79 So.2d 199. We entertain no doubt that such picketing would be for an unlawful purpose and enjoinable. Local Union No. 10, etc. v. Graham, supra. Sections 56–1303 and 56–1307, A.C.A. 1952 Supp. (sections 23–1303 and 23–1307, A.R.S.). The matter of whether the purpose of defendant union's

peaceful picketing was to compel the restaurant plaintiffs to reinstate the strikers in violation of our right-to-work laws points up two key questions: (1) Does the evidence support a finding that a continuing purpose of defendant's picketing was to compel such reinstatement? (2) Had the relationship of employer-employee ceased between the strikers and the plaintiffs' establishments to the extent that the strikers stood as mere strangers at the gate?

It is clear from the record that there is ample evidence to support the trial court's finding that it was a continuing objective of defendant union's picketing to force the restaurant plaintiffs to agree to discharge the non-union replacements (intervening plaintiffs) in favor of the union strikers. Defendant union's secretary-treasurer went so far as to testify in effect that he intended to continue the picket line until a satisfactory settlement of the reinstatement matter was achieved. This testimony alone would be sufficient to support the trial court's finding on this score. But when such is considered in the light of the other evidence we think the trial court would have been credulous indeed to have found otherwise on this issue.

It remains only to determine whether the pickets in this case stood as mere strangers at the gates of their former employers or perhaps in law enjoyed some favored position because of the circumstances under which they left their jobs. It is our opinion that they stood as mere strangers. We have already pointed out that in striking to compel the execution of its proposed agreement (exhibit B) the defendant union was attempting to force the restaurant plaintiffs to submit to each of the four controversial contract clauses, supra, defined below.

The "one owner" clause effectively provides that not more than one bona fide working owner can perform any work coming under the jurisdiction of the union; that all other owners in a particular establishment who are engaged in tasks encompassed within such jurisdiction must be employed in full accordance with all of the terms and conditions of the agreement.

The "agency-shop" clause requires that all of the employees of a signatory employer, not members of the union, either tender to the union a periodic assessment equal to the prevailing union dues, or "the employers will on demand of the union discharge any employee who has failed to tender to the union the assessments prescribed by this agreement."

The "joint examining board" clause provides for the establishment of a board to consist of six members; three to be appointed by the union and three by the employers. The ostensible purpose of the

board is to qualify and classify prospective employees in accordance with their ability and character. Within the meaning of this clause no one is eligible for employment until he has acceptably passed this board.

The "hiring hall" clause makes it mandatory that an employer who is in need of employees notify the union of the existence of job vacancies, and allow the union a minimum of twenty-four hours to supply examining-board-qualified personnel to fill the vacancies before such employer is authorized to make selections at large to fill the vacancies.

Since the "one owner" clause provides that owners in excess of one must be employed in accordance with all the terms of the collective bargaining agreement, it is apparent that if the proposed collective bargaining contract (exhibit B) were executed each owner would have to submit to the "agency-shop" clause, "joint examining board" clause, and presumably also the "hiring hall" provision. Effectively, this would force owners in excess of one to pay the equivalent of union dues and fees, be qualified by an examining board on which the defendant union maintained a veto power, and be cleared through the union hiring hall, as conditions to working in their own establishments.

In determining the lawfulness of the "one owner" clause as a collective bargain-ing objective of the strike under our law, we must weigh the rights of the working men to improve their positions through the media of picketing and work stoppage, and the fundamental right of an owner to conduct his business without undue impediment and oppression. Saveall v. Demers, 322 Mass. 70, 76 N.E.2d 12, 2 A. L.R.2d 1190; Dinoffria v. International Brotherhood, etc., 331 Ill.App. 129, 72 N.E.2d 635; error dismissed 399 Ill. 304, 77 N.E.2d 661; Safeway Stores v. Retail Clerks International Ass'n, 41 Cal.2d 567, 261 P.2d 721.

After objective application of this test we are in complete agreement with the trial court that to permit a union to force an owner of a business to agree to a "one owner" provision such as that above defined " * * * would be a violation of the most fundamental and basic American right of a man to engage freely in private enterprise without undue hindrance * *." Accordingly we hold that to strike for the purpose of compelling an employer to submit to inclusion of a "one owner" clause such as that above defined, renders its purpose unlawful as destructive of the basic and fundamental right of free men to be self-employed without undue hindrance and interference. Saveall v. Demers, supra. This conclusion makes it unnecessary to rule on the legality of any of the four clauses when tested under the right-to-work amendment, supra. The strike here in-

volved having been called for an unlawful purpose, it also becomes unnecessary to determine the legal status of employees who strike to achieve legitimate ends.

 We are convinced, as was the trial court, that if the strike had been called for the purpose of forcing the restaurant plaintiffs to sell drinks to patrons after legal closing hours, such would have been an unlawful strike, and the restaurant plaintiffs would have been justified under the law to have regarded the relationship of employer-employee terminated with respect to the strikers. See: National Labor Relations Board v. Indiana Desk Co., 7 Cir., 149 F.2d 987; Sax v. National Labor Relations Board, 7 Cir., 171 F.2d 769. It logically and reasonably follows that in the instant case, where the purpose of the strike was at least in part to achieve unlawful objectives, the restaurant plaintiffs could in like manner regard the employment of the strikers at an end. Such employers were then free to unconditionally employ personnel from the open labor market to fill the vacancies created. Consistent with this finding we hold that the status of the strikers in this case, as they picketed the establishments of the restaurant plaintiffs, was that of mere strangers. We are therefore confronted with a situation where union members who stood as mere strangers persisted in picketing the restaurant plaintiffs' establishments for the purpose of forcing them to discharge non-union employees. Such we have already concluded constitutes picketing for an unlawful purpose within the meaning of our right-to-work law, and such picketing, however peaceful, can be enjoined. But we have observed that, while peaceful picketing for an unlawful purpose can be totally enjoined, a general prohibition against peaceful picketing constitutes an unconstitutional abridgement of the right of free speech. Consistent with this proposition we are constrained to also find that a court must tailor an injunction directed against peaceful picketing to meet specific purposes which are established by the facts as violative of existing law. Milk Wagon Drivers Union, etc. v. Meadowmoor Dairies, 312 U. S. 287, 61 S.Ct. 552, 85 L.Ed. 836; Thornhill v. State of Alabama, supra; Building Service Employees International Union v. Gazzam, supra. It is apparent that to rule otherwise would give unconstitutional sanction to our courts to direct a general restraint on peaceful picketing for all purposes for all time. Accordingly we affirm the decree prohibiting all picketing by defendant union but direct that the trial court tailor its injunction so as to specify with particularity the unlawful purposes of defendant union's picketing which form the bases therefor.

 We are not called upon to rule upon every theory under the findings upon which the decree appealed from could possibly be grounded, or upon the propriety of

each finding of fact and conclusion of law. Enough it is that we find, as we have, that there are presented findings supported by competent testimony upon which the decree, under our law, can properly be predicated. Such having been established we deem it unnecessary to rule upon the numerous other assignments which the defendant union has submitted for our consideration.

The decree is affirmed subject to modification consistent with this opinion. Appellees are to have their costs on appeal.

UDALL, C. J., and WINDES, PHELPS and STRUCKMEYER, JJ., concurring.

PHELPS, Justice (specially concurring in result).

I concur in the end result reached by the majority but do not agree that section 56–1310, 1954 Supp. A.C.A.1939 (A.R.S. section 23–1322) is unconstitutional, nor that the right to picket is guaranteed under the provisions of the 14th Amendment to the Federal Constitution. I agree that it is universally conceded that state courts are bound by the decisions of the Supreme Court of the United States in its interpretations of the Federal Constitution and the amendments thereto. However, when that Court gives to its language an interpretation in itself unconstitutional, and designed to expand the powers of the Federal Government to include control over special groups in the various states of the union, by a process of pure sophistry, as a member of this Court, I shall protest such invasion whenever the occasion arises.

In the case of Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, the court held a statute of that state to be unconstitutional upon the ground that it violated the 14th Amendment to the Constitution of the United States, providing that no state shall "deprive any person of life, liberty, or property, without due process of law." The statute reads as follows:

"Loitering or picketing forbidden— Any person or persons, who, without a just cause or legal excuse therefor, go near to or loiter about the premises or place of business of any other person, firm, corporation, or association of people, engaged in a lawful business, for the purpose, or with intent of influencing, or inducing other persons not to trade with, buy from, sell to, have business dealings with, or be employed by such persons, firm, corporation, or association, or who picket the works or place of business of such other persons, firms, corporations, or associations of persons, for the purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another, shall be guilty of a misdemeanor; but nothing herein shall prevent any person from solicit-

ing trade or business for a competitive business." Code Ala.1923, § 3448.

The court stated, and properly so, that the word "liberty" encompasses "freedom of speech" guaranteed under the 1st Amendment to the Constitution.

In reaching the conclusion that the Alabama statute was unconstitutional, the court misinterpreted a quoted excerpt from the opinion of Justice Brandeis in the case of Senn v. Tile Layers Protective Union, Local No. 5, 301 U.S. 468, at page 478, 57 S.Ct. 857, at page 862, 81 L.Ed. 1229, which reads as follows:

"* * * Members of a union might; without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution."

It will be observed that Justice Brandeis didn't say in the Senn case that picketing was justified under the "freedom of speech" clause of the 1st Amendment to the Federal Constitution. He merely stated that members of a union could make known the facts of a labor dispute as a matter of free speech as guaranteed under the Constitution. He did not pretend to say how this information was to be communicated to come within the free speech clause. It is pretty generally conceded now that the statement of Justice Brandeis above quoted, is pure dictum, yet, it forms the basis in the Thornhill case which Justice Murphy

used as a grapevine swing to reach the conclusion that, the right to peacefully picket for a lawful purpose is guaranteed under the "freedom of speech" clause of the 1st and 14th Amendments to the Federal Constitution.

The conclusion reached by the court has nothing more solid as a foundation upon which to rest than the mere assertion of the court (without precedent), and is wholly without logic to support it. It is the result of a philosophy alien to the atmosphere encompassing the deliberations of the constitutional convention and the legal concepts upon which this government is founded. It is a philosophy designed to invest the central government at Washington with authority to control, in minute detail, the acts and conduct of the citizens of the sovereign states of the union, both as individuals and as groups, concerning matters which had heretofore been considered as of local concern. It seeks to delete the 10th Amendment from the Constitution providing that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

It is a philosophy based upon the assumption that it (The United States Supreme Court) is vested with both the legislative and policy making power of the states of the union and of the nation, which has heretofore been considered to be the func-

tion of the legislatures of the sovereign states, and of the Congress of the United States. It recognizes no limitations upon its own power. It distinguishes between twiddlededee and twiddlededum in determining what constitutes "advocating the overthrow of this Government" by its enemies. It asumes to itself, under the Due Process Clause of the 14th Amendment, the power to pass upon the character and moral qualifications of lawyers seeking admission to practice law in a sovereign state of the union, and to order that they be permitted to take the bar examination, thereby setting aside the mandate of the highest court of that state declaring the applicant morally unfit to become a member of that honorable profession. This was contrary to the holding in Ex parte Secombe, 19 How. 9, 60 U.S. 9, 15 L.Ed. 565, an excerpt of which was quoted in Ex parte Garland, 4 Wall. 333, 379, 71 U.S. 333, 366, 18 L.Ed. 366, cited by Justice Black, who wrote the opinion for the court.

It has assumed to deny an American citizen the legal power to dispose of his own property by will in the manner he desired, even though recognized as valid for over a hundred years. It has assumed to dictate the business policy of a street railway system in a southern city wholly unrelated to interstate commerce, and to control the administration of public schools in southern states. It is a philosophy I shall never sanction by the approval of any portion of it.

Although the interstate commerce clause of the Federal Constitution has been by some strange alchemic process of transmutation, transformed by that court into a ninety per cent rubber content, it appears to not have had sufficient elasticity to encompass the picket line. And resort is now had to the 1st and 14th Amendments in order to invest the central government with complete control, not only over all legitimate labor disputes between employer and employee but, it now has firmly established the picket line on the very threshold of the employer's business. It has vested it with the constitutional right to maintain such line under the guise of "freedom of speech" where neither a labor dispute nor the relation of employer and employee exists, even though its result is to damage or destroy the owners' business. See A. F. L. v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855.

As was said by Chief Justice Qua in Saveall v. Demers, 322 Mass. 70, 76 N.E.2d 12, 14, 2 A.L.R.2d 1190:

"If picketing is speech it is certainly also much more. However peacefully it may be carried on, it possesses elements of compulsion upon the person picketed which bear little relation to the communication to any one of information or of ideas. And resort is

commonly had to it precisely because of these elements, which, much more than any force of argument contained in it, give it the power it possesses. * * *"

Professor Charles O. Gregory of the University of Virginia, who is reputed to be a most eminent authority on labor law, denies that the right to picket is guaranteed under the "freedom of speech" clause and, states that it is a method of coercion used by unions to obtain some economic advantage, and Mr. Ludwig Teller in an article in Vol. 56, Harvard Law Review, p. 180 et seq., takes the view that instead of picketing being a form of "free speech" it is a form of economic pressure. He asserts that it does not invoke discussion but, is rather a physical activity more in the nature of a *parade* which the United States Supreme Court had held in Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, could be prohibited by statute, and declared a statute in New Hampshire to be valid which prohibited unlicensed *parades* and *processions* in that state.

That the establishment of a picket line, although peaceful, is far more coercive than persuasive there can be no doubt. It is a means of intimidation and carries with it the implication of a reserved force available for use if deemed necessary by the union. No one likes to cross a picket line who believes in the right of labor to bargain collectively, and to strike where there

exists a labor dispute between the employer and employee as to conditions of employment under which employees are required to work, or as to the adequacy of the wages paid, etc. The belief is practically universal that labor does and should enjoy these rights under such circumstances, and to maintain a picket line to enforce such rights.

I heartily subscribe to this view but, I do not subscribe to the doctrine enunciated by the United States Supreme Court that such right is guaranteed under the "freedom of speech" clause in the 1st and 14th Amendments to the Federal Constitution. Very frequently but little information is disseminated by the placards displayed. In many instances there is nothing communicated upon which a sound judgment as to the merits of the controversy can be based, or even the nature of the controversy or what relation, if any, exists between the picketers and the picketed. Placards displayed state only conclusions. The very nature of the picket line makes it impractical and impossible to apprise the public of the facts.

Where the relation of employer and employee does not exist and no labor dispute is present, it is my view that the right to picket under such circumstances, should be left to the wisdom of the various states of the union to provide, through legislative enactment, standards by which its lawfulness can be determined. In any event,

it cannot logically be held to be a violation of the 1st and 14th Amendments to the Federal Constitution. To so hold gives the Federal Government, by judicial legislation, the exclusive power to control matters that are and should be of purely local concern. It simply constitutes another of the many encroachments by the Supreme Court upon the sovereign rights of the states.

The coercion or implied force of the picket line in its impact upon the citizenry of the area overshadows any thought that picketing manifests in any considerable degree, the element of "freedom of speech" as used in the 1st and 14th Amendments. This is now so considered to be true even by the Supreme Court itself.

Since the Thornhill and Swing cases, supra, Justice Douglas, speaking for himself and Justices Black and Murphy, said in Bakery & Pastry Drivers & Helpers Local, etc. v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 819, 86 L.Ed. 1178, that " * * * picketing might have a coercive effect. * * * " and that

> "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. * * * "

And in the case of Carpenters & Joiners Union of America, etc. v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143, wherein Ritter operated a cafe fully unionized, engaged a contractor employing nonunion labor to build a residence for him about one mile distant from his restaurant. The carpenters threw a picket line around his restaurant. The Supreme Court of Texas enjoined the picketing upon the ground that it violated a Texas antitrust statute. The United States Supreme Court affirmed the decision of the Texas Supreme Court, holding that the state of Texas had the right to confine picketing to the area directly related to the dispute. It appears to me that if the right to picket is guaranteed under the "freedom of speech" clause there is no sound reason for confining it to the area where the nonunion labor is being employed and denying it at the restaurant of Ritter, where the speech would be far more articulate than in the area where Ritter is building a house with nonunion labor. The court's decision in the Ritter case appears to me to be contradictory to the doctrine laid down in the Swing case which held unconstitutional an injunction against peaceful picketing, based upon a state's common law policy prohibiting picketing when there was no immediate dispute between employer and employees.

In the case of International Brotherhood of Teamsters, Local 695, A. F. L. v. Vogt, Inc., 77 S.Ct. 1166, 1167 authored by Justice

Frankfurter, the court passed upon the constitutionality of a Wisconsin statute which made it an unfair labor practice for an employee individually or in concert with others to "coerce, intimidate or induce any *employer* to interfere with any of his employees in the enjoyment of their legal rights * * *." (Emphasis ours.) The Supreme Court of Wisconsin on rehearing, 270 Wis. 315, 74 N.W.2d 749, reversed its former opinion, 270 Wis. 315, 71 N.W.2d 359, and enjoined picketing by union employees who were carrying placards reading: "The men on this job are not 100% affiliated with the A. F. L." The decision of the Wisconsin Supreme Court was based upon the ground that the picketers were engaged in an unfair labor practice in picketing their employer, in that, they were doing so to coerce the employer to interfere with its employees in their right to join or refuse to join the union. Justice Frankfurter held the statute to be constitutional and affirmed the Supreme Court of Wisconsin in upholding an injunction prohibiting the picketing under such circumstances. He sought desperately to dispel the confusion that has grown out of the Thornhill case by saying in the nature of an apology that: "It is inherent in the concept embodied in the Due Process Clause that its scope be determined by a 'gradual process of judicial inclusion and exclusion'. * * *"

It is now clear that the concept pronounced in the Thornhill case was half-baked when it was introduced into the body of the law of the nation, and in its present condition cannot even be said to have any definitive limits or contents. It is certainly not sufficiently plain to enable those skilled in the law to understand it or to define it so others can understand it.

Justice Douglas, with whom Chief Justice Warren and Justice Black concurred, dissented and stated:

"The Court has now come full circle. In Thornhill v. State of Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093, we struck down a state ban on picketing on the ground that 'the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.' * * *" [77 S.Ct. 1172]

He then proceeded to point out the various cases since decided that had the effect of departure from the Thornhill decision. The court, in one breath, declares picketing to be a form of "Free Speech", and in the next breath it declares it to be more than "Free Speech".

It is my view that if picketing cannot be said to be synonymous with "Free Speech" or that it is at least free from the elements of compulsion or implied threat, such con-

cept is unsound and should not be injected into the law. It is vicious in its consequences. If it is not capable of being clearly defined, either in its content or its limits, it should not be given the dignity of a legal concept by the highest tribunal in the nation, and by it embodied in the law of the land as a rule of conduct for employers and employees.

As I stated in the outset, I cannot agree that section 56–1310, 1954 Supp. A.C.A1939 (A.R.S. section 23–1322), set out haec verba in the majority opinion, is unconstitutional. As I understand the majority opinion, it holds that this section is unconstitutional, for the reason that it violates the 1st and 14th Amendments to the Federal Constitution guaranteeing "freedom of speech" to the citizens of the United States, and that it applies both to minority groups in a union occupying the relation of employer and employees with the business picketed, and also, to total strangers to such business employer.

Under our form of government public officials are selected, and all laws, both state and federal, governing the conduct of citizens in this country, are enacted by majority rule. Business conducted by corporations and other groups is controlled by majority rule. In collective bargaining between employer and employees it is the concensus of the majority of employees that determines the primary terms of the contract, and when a strike is called for a violation of such contract or other legitimate reason, it must obtain a majority of its members to call such strike. It is the majority of the members of courts that develops the body of the law of the states and of the nation.

But, the majority rule is ignored under the law now being pronounced by this Court in conformity with the decision of the Supreme Court of the United States simply because that Court, when it approached the sanctuary of the picket line, required no majority to establish it. In this area of human action a minority may picket the business of an employer although the majority of the employees have no grievance whatever, but, under the established principles of the Union Code of Ethics, I presume the majority cannot, in good conscience, cross the picket line. For example, if 49% of the employees of a business may picket their employer against the wishes of 51% thereof, under the guise of freedom of speech 20% or even 5% of the employees may do so. This philosophy appears to me to be unrealistic in a country committed to majority rule. It is unsound. It is un-American.

I was a member of a union. I went out on a strike in an effort to get a higher wage. I, with others, picketed the business of the employer but, there existed the relation of employer and employee between us. There was a labor dispute between us which could not be resolved otherwise. But I cannot subscribe to the view that persons whom an

employer has never known and with whom the relation of employer and employee has never existed, have the right to picket and perhaps to damage or destroy his business in order to force him to adopt a policy concerning his property rights which he believes to be disadvantageous, both to himself and to his employees, and in many and perhaps most instances his employees are in full accord. Such action cannot be logically justified under the "freedom of speech" clause of the Federal Constitution any more than it would give them the right to slander him by word of mouth, and to damage or destroy his reputation.

It is my view that the sovereign state of Arizona had the right, under the powers reserved to it in the 10th Amendment to the Federal Constitution, to enact section 56–1310, supra (now section 23–1322), and that it violates no provision of the Federal Constitution. This Court should so hold.