Ronald J. FICEK et al., Plaintiffs
and Appellees,

v.

INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, IRON SHIP BUILD-
ERS, BLACKSMITHS, FORGERS AND
HELPERS, LOCAL # 647, Defendant and
Appellant,

and

Fargo Foundry Steel and Manufacturing
Company, a corporation, Defend-
ant and Appellee.

Civ. No. 8966.

Supreme Court of North Dakota.

June 26, 1974.

Lanier, Knox & Olson, Fargo, and Sigal & Savelkoul, Minneapolis, Minn., for defendant and appellant.

Conmy, Feste, DeMars & Bossart, Fargo, and Rex H. Reed, National Right to Work Legal Foundation, Washington, D. C., for plaintiffs and appellees.

Wattam, Vogel, Vogel & Peterson, Fargo, for Fargo Foundry Steel and Mfg. Co.

PAULSON, Judge.

This is an appeal by the defendant, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local # 647 [hereinafter "the Union"], from a judgment of the Cass County District Court, which judgment declared the agency shop and dues "checkoff" provisions contained in a labor contract between the Union and the defendant, Fargo Foundry Steel and Manufacturing Company [hereinafter "the Company"], to be illegal, void, and unenforceable because such provisions are in violation of the North Dakota Right to Work Law, namely, § 34–01–14 of the North Dakota Century Code.

On November 13, 1972, the parties stipulated certain facts. Those which are relevant to this appeal are:

– The Company is a corporation engaged in the operation of a foundry and steel fabrication and manufacturing business which is an industry affecting interstate commerce.

– The Company employs approximately 100 employees who are within an exclusive collective bargaining unit of production and maintenance employees represented by the Union.

– As the exclusive bargaining agent for said employees, the Union negotiated a labor contract with the Company to be effective from January 3, 1972, to December 31, 1974. Article I of that labor contract, in pertinent part, reads:

"ARTICLE I—RECOGNITION

"It is mutually agreed that the Company shall recognize the Union as the sole

bargaining agent for all of its production and maintenance employees who have completed 120 days employment with the Company in the performance of all work coming within the terms of this agreement. (This shall not be construed to cover watchmen, salesmen, office or clerical employees, City desk clerks, foremen and supervisors.)

*"Membership in the Union is not compulsory. However, all employees represented by the Union who do not elect to join the Union shall as a condition of continued employment, pay to the Union, an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount equal to the Union's regular and usual dues.* If any provision of this section shall become invalid under the laws of the State of North Dakota, such provision shall be modified to comply with the requirements of state law, or shall be renegotiated for adequate replacement." [Emphasis added.]

Article 3 of such labor contract reads:

"ARTICLE 3—CHECK OFF DUES

"Subject to the provisions of the Labor-Management Relations Act of 1947, the company shall, for the duration of this agreement, deduct from the last pay of each month, the union dues of employees for the preceding month, and shall promptly remit same to the proper officer of the Union. *The Employer shall make deduction for the non-union employees who are members of the bargaining unit."* [Emphasis added.]

In addition to the stipulated facts, the testimony adduced at the hearing established that, at the time of the commencement of this action, the plaintiffs, Ronald J. Ficek, Theodore M. Brodell, and Cyril L. Dombeck [hereinafter "the nonunion employees"] were the only nonunion members of the 100-member bargaining unit. Pursuant to Articles I and 3 of the labor

contract, the nonunion employees were notified by the Company that unless they signed an authorization for the dues "checkoff" they would be fired. In order to retain their jobs, the nonunion employees, under protest, authorized said "checkoff". The Company then deducted such dues-equivalent from the wages of the nonunion employees and delivered the money so collected to the Union.

Subsequently, the nonunion employees commenced a declaratory judgment action in the Cass County District Court against the Company and the Union for a declaration of the rights of all the parties under the North Dakota Right to Work Law, and for injunctive relief to prevent the Company and the Union from enforcing the agency-shop and dues-checkoff provisions contained in the labor contract.

The trial court held in favor of the nonunion employees with reference to the illegality of the first two sentences of paragraph 2 of Article I and the last sentence of Article 3 of the labor contract. However, after the entry of such judgment, its execution was stayed in order to allow this appeal, on condition that the Union reimburse the nonunion employees in the event the trial court's holding is sustained.

During the pendency of the action before the trial court, Mr. Ficek voluntarily resigned his position with the Company.

Article I of the labor contract calls for the implementation of an "agency shop". An "agency shop" is a union-security device whereby, in order to continue employment, any nonunion member employee is required to pay to the Union sums equivalent to those paid by union members, either in an amount equal to both union dues and initiation fees, or, as in the labor contract involved in the instant case, in an amount equal to dues alone.

The question presented by this appeal is whether the "agency shop" provision is prohibited by the North Dakota Right to Work Law.

In order to interpret the North Dakota Right to Work Law, a discussion of the Federal legislation which also affects the use of union-security devices is necessary.

In 1935, Congress enacted the National Labor Relations Act [29 U.S.C.A. § 151 et seq.], which is commonly referred to as the Wagner Act. Section 7 of the Wagner Act guaranteed to employees the right to self-organize, and, pursuant to that section, employers and unions had the freedom to select a form of union security on which they could agree and which was not proscribed by such Act.

In 1947, Congress amended the Wagner Act by enacting the Labor Management Relations Act [29 U.S.C.A. § 141 et seq.], which is commonly referred to as the Taft-Hartley Act, which Act guaranteed the right of employees to refrain from participating in any or all union activities. However, in order to afford unions some protection, several union-security devices were authorized under § 8(a)(3) of the Taft-Hartley Act [29 U.S.C.A. § 158(a)(3)], which provides, in pertinent part:

> "*Unfair labor practices.* It shall be an unfair labor practice for an employer—
>
> .    .    .    .    .    .
>
> "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization .  .  . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later  .  .  . *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization  .  .  . (B) if

he [the employer] has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

Congress nevertheless yielded to the States the authority to ban union-security devices by providing, in § 14(b) of the Taft-Hartley Act [29 U.S.C.A. § 164(b)]:

> "(b) Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

In 1963, the United States Supreme Court was confronted with the task of interpreting and applying this Federal legislation in the cases of National Labor Relations Board v. General Motors Corporation, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed. 2d 670 (1963); and Retail Clerks Local 1625 v. Schermerhorn, 141 So.2d 269 (Fla. 1961), 373 U.S. 746, 83 S.Ct. 1461, 10 L. Ed.2d 678; 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179.

In the *General Motors* case, *supra,* the United Auto Workers Union filed refusal-to-bargain charges with the NLRB because General Motors had refused to negotiate on an agency-shop agreement. General Motors contended that, since the express words of the saving proviso of § 8(a)(3) of the Taft-Hartley Act allow employment to be conditioned upon "membership" and the agency-shop provision did not require actual membership, the agency-shop provision is not within the purview of the saving proviso. Accordingly, General Motors argued that all agency shops were unlawful and that it therefore would be an unlawful labor practice to bargain for such agency shops.

The United States Supreme Court rejected General Motors' contention and held that General Motors was not excused from bargaining for an agency shop, stating, in *General Motors, supra* 373 U.S. at 742–743, 83 S.Ct. at 1459:

". . . the 1947 amendments not only abolished the closed shop but also made significant alterations in the meaning of 'membership' for the purposes of union-security contracts. Under the second proviso to § 8(a)(3), the burdens of membership upon which employment may be conditioned are expressly limited to the payment of initiation fees and monthly dues. It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues. 'Membership' as a condition of employment is whittled down to its financial core. This Court has said as much before in Radio Officers' Union v. Labor Board, 347 U.S. 17, 41, 74 S.Ct. 323, 336, 98 L.Ed. 455:

" 'This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. Thus Congress recognized the validity of unions' concern about "free riders," *i. e.,* employees who receive the benefits of union representation but are unwilling to contribute their fair share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason. . . .'

"We are therefore confident that the proposal made by the union here conditioned employment upon the practical equivalent of union "membership," as Congress used that term in the proviso to § 8(a)(3)."

The reasoning of the United States Supreme Court in *General Motors, supra*, to the effect that the agency shop conditions employment on the practical equivalent of union "membership" was subsequently applied by that same Court in *Schermerhorn, supra*, where it held that the States have the authority to outlaw agency shops.

In *Schermerhorn*, the nonunion employees of a Florida supermarket chain were required, under an agency-shop arrangement, to pay service fees for the purpose of aiding the union in defraying costs in connection with its obligations as the employees' exclusive bargaining agent. Four nonunion employees instituted a class action in the Florida state courts, seeking, among other relief, a declaration that such agency-shop provision violated Florida's Right to Work Law (§ 12, Fla.Const.), which reads:

"The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union, or labor organization; provided, that this clause shall not be construed to deny or abridge the right of employees by and through a labor organization or labor union to bargain collectively with their employer."

The Florida trial court dismissed the action on the ground that the agency-shop arrangement did not violate the Florida Right to Work Law, and the Florida Supreme Court reversed. On certiorari, the United States Supreme Court affirmed the decision of the Florida Supreme Court, holding, in *Schermerhorn, supra* 373 U.S. at 747, 83 S.Ct. at 1463:

"We have concluded that the contract involved here is within the scope of § 14(b) of the National Labor Relations Act and therefore is congressionally made subject to prohibition by Florida law."

In arguments before the United States Supreme Court, the union contended that § 14(b) of the Taft-Hartley Act allowed the

States to outlaw only those agreements which require union "membership" as a condition of employment and that the agency-shop provision in fact did not so require. The United States Supreme Court disagreed, and stated, in *Schermerhorn, supra* 373 U.S. at 751, 83 S.Ct. at 1464:

"As is immediately apparent from its language, § 14(b) was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements. And it was the proviso to § 8(a)(3), expressly permitting agreements conditioning employment upon membership in a labor union, which Congress feared might have this result. It was desired to 'make certain' that § 8(a)(3) could not 'be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy.' [Citation omitted.]

"The connection between the § 8(a)(3) proviso and § 14(b) is clear. Whether they are perfectly coincident, we need not now decide, but unquestionably they overlap to some extent. At the very least, the agreements requiring 'membership' in a labor union which are expressly permitted by the proviso are the same 'membership' agreements expressly placed within the reach of state law by § 14(b). It follows that the *General Motors* case rules this one, for we there held that the 'agency shop' arrangement involved here—which imposes on employees the only membership obligation enforceable under § 8(a)(3) by discharge, namely, the obligation to pay initiation fees and regular dues—is the 'practical equivalent' of an 'agreement requiring membership in a labor organization as a condition of employment.'"

■ The United States Supreme Court, in the second case of *Schermerhorn*, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179, considered the sole question, that is: whether the Florida courts, rather than solely the National Labor Relations Board, are tribunals with jurisdiction to enforce the State's prohibition against an "agency shop" clause in a collective bargaining agreement. That Court held that the Florida courts, rather than solely the National Labor Relations Board, are tribunals with jurisdiction to enforce the State's prohibition against an "agency shop" clause in an executed collective bargaining agreement. We agree with such holding.

■ The United States Supreme Court has thus made it plain that the agency-shop agreement which leaves union membership optional with employees is a lawful form of union security under § 8(a)(3) of the Taft-Hartley Act. However, since the agency shop is within the sanction of § 8(a)(3), the United States Supreme Court held that it is likewise within the purview of § 14(b) of the Taft-Hartley Act, which allows States to proscribe union-security agreements which are permitted by the Federal Act. It follows that the States are authorized under § 14(b) of the Taft-Hartley Act to outlaw agency-shop agreements.

Twelve States: Alabama, Arkansas, Georgia, Iowa, Mississippi, Nebraska, North Carolina, South Carolina, Tennessee, Utah, Virginia, and Wyoming, have exercised their authority by enacting laws which specifically prohibit the payment to a union of dues, fees, or other charges as a condition of employment. In addition, six other States: Arizona, Florida, Kansas, Nevada, South Dakota, and Texas, have enacted legislation similar to the North Dakota Right to Work Law. Of these six States, the Attorneys General of South Dakota and Texas have issued opinions declaring agency-shop provisions illegal under their respective State's laws; and the States of Arizona, Kansas, Florida, and Nevada have court decisions reaching the same result.

The first State court to hold an agency-shop provision illegal under a right-to-work law similar to the North Dakota Right to Work Law was the Arizona Su-

perior Court. In Arizona Flame Restaurant, Inc. v. Baldwin (August 3, 1954, Ariz.Super.Ct.), 26 CCH Labor Cases ¶ 68,647, affirmed as modified 82 Ariz. 385, 313 P.2d 759, a number of bar and restaurant establishments commenced an action seeking to enjoin picketing by members of the Hotel and Restaurant Employees and Bartenders Union. The picketing was intended to induce the employers to enter into a labor contract, which contract contained an agency-shop provision which required all employees who were not members of the union either to tender to the union a periodic assessment equal to the prevailing union dues or to be discharged upon request by the union.

The Arizona Superior Court held that the agency-shop clause violated the Arizona Right to Work Laws, 8 Ariz.Rev.St. Anno, § 23–1302 of which reads:

"*Prohibition of agreements denying employment because of nonmembership in labor organization.* No person shall be denied the opportunity to obtain or retain employment because of nonmembership in a labor organization, nor shall the state or any subdivision thereof, or any corporation, individual, or association of any kind enter into an agreement, written or oral, which excludes a person from employment or continuation of employment because of nonmembership in a labor organization."

The Arizona Superior Court said, in *Arizona Flame, supra* 26 CCH Labor Cases ¶ 68,647, at page 87,172:

"In light of the definition of a 'labor organization' within the Right to Work Laws as meaning 'any organization of any kind, or any employee representation committee or plan, in which employees participate,' it is clear that it was the intent of the electorate to forbid both management and labor from imposing the requirement upon any person, as a condition of his employment, the participation by him in any form or scheme of employee representation. Consequently, it

would require a most narrow and unrealistic construction of the existing laws to sanction a contract that would require employees not belonging to a union to contribute an assessment equal to the union dues to obtain or retain employment."

A similar result was reached by the Kansas Supreme Court in 1961, in Higgins v. Cardinal Manufacturing Co., 188 Kan. 11, 360 P.2d 456, cert. denied 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32, wherein the Kansas Supreme Court reversed the trial court and held that an agency-shop provision violated the Kansas Right to Work Amendment. In *Higgins,* a group of nonunion employees sought an injunction against the enforcement of a collective bargaining agreement containing an agency shop. The trial court held that the nonunion members' petition for an injunction did not state a cause of action and the agency-shop provision was ruled not to come within the scope of the Kansas Right to Work Amendment [Kan.Const., Art. 15, § 12], which reads:

"*§ 12. Membership or nonmembership in labor organizations.* No person shall be denied the opportunity to obtain or retain employment because of membership or nonmembership in any labor organization, nor shall the state or any subdivision thereof, or any individual, corporation, or any kind of association enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of membership or nonmembership in any labor organization."

Initially, the Kansas Supreme Court showed that it recognized the problem involved in the *Higgins* case by stating, 188 Kan. at 16, 360 P.2d at 460:

"The issue of union security presented by this case brings into focus a conflict between two firmly-held American beliefs: The belief that a worker should not be required to support an organization which he may oppose, and the belief that a worker should not be a 'free rider'

who takes advantage of benefits secured by a union without contributing his share to its support. That issue has been the subject of legislation at both the state and national levels."

In order to determine whether the agency-shop provision involved in the *Higgins* case violated the Kansas Right to Work Amendment, the Kansas Supreme Court first construed and interpreted that State's Right to Work Law, using the following guidelines, in *Higgins, supra* 360 P.2d at 464:

"This court has held when the interpretation of a statute (not penal in nature) according to the exact and literal import of its words would defeat the manifest purpose of the legislature in its enactment, it should be construed according to its spirit and reason, disregarding as far as may be necessary the strict letter of the law [citation omitted]. One of the specific matters which may be considered in ascertaining the intention of the legislature, where it becomes material, is to fix what the situation was at the time of the enactment of the particular statute in controversy."

The Kansas Court, in *Higgins,* after determining that the drafters of the Kansas Right to Work Amendment must have been aware of the import of the National Labor Relations Act, as amended, and that, therefore, decisions interpreting such Act were relevant, stated, in *Higgins, supra* 360 P.2d at 464–465:

"By virtue of the language in section 8(a)(3)(B) of the Taft-Hartley Act . . . it is apparent that the authority granted under this section is not primarily to compel membership in the union, but to permit the unions to *require* workers to pay dues and initiation fees to support the union. This is made clear by the Supreme Court of the United States in Radio Officers Union v. Labor Board, 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455. . . .

.    .    .    .    .    .

"It is clear from the foregoing . . . [that] Congress intended that an employee who paid the required union initiation fees and dues fulfilled his obligation under a union shop contract, and that *the union could not require any other act as a condition of employment* usually required prior to becoming a member. Therefore, since the payment of union dues and fees is the only support of the union permitted by federal law *for unions to require as a condition of employment* under union-security agreements, and not actual membership, the expression 'membership in a labor organization as a condition of employment' in section 14(b) of the Taft-Hartley Act becomes synonymous with payment of union dues and fees for enforcement purposes under union-security agreements so far as labor unions or employers are concerned.

.    .    .    .    .    .

"The natural and logical interpretation of the Kansas constitutional amendment, prohibiting compulsory membership in a labor organization as a condition of employment or continued employment, includes by necessary implication a prohibition against forced payment of initiation fees, union dues and assessments, or the equivalent, by a worker to a labor organization as a condition of employment or continued employment. This, we think, is the real and rather well-hidden meaning of the language employed by the legislature of Kansas in drafting the constitutional amendment submitted for referendum."

The Florida Supreme Court, in Schermerhorn v. Local 1625 of Retail Clerks Int. Ass'n, 141 So.2d 269, 272–273 (Fla.1961) cert. granted 371 U.S. 909, 83 S.Ct. 253, 9 L.Ed.2d 169, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179; 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963), interpreting the

Florida Right to Work Law as prohibiting the agency shop, stated:

"This section [F.S.A.Const. Declaration of Rights, § 12 Art. 5, § 4] clearly bestows on the workingman a right to join or not to join a labor union, as he sees fit, without jeopardizing his job. Inasmuch as the Constitution has granted this right, the agency shop clause is repugnant to the Constitution in that it requires the non-union employee to purchase from the labor union a right which the Constitution has given him. The Constitution grants a free choice in the matter of belonging to a labor union. The agency shop clause contained in the contract under consideration purports to acknowledge that right, but in fact, abrogates it by requiring the non-union worker to pay the union for the exercise of that right or, in the alternative, to be discharged from his employment. Such an arrangement is palpably and totally inconsistent with the freedom of choice contemplated by our Declaration of Rights, Section 12.

"The appellees contend that, except for the 'agency-shop' provision, the non-union employees of the appellant Food Fair would be 'free riders,' that is, they would reap the benefits of union representation without having to bear any of the cost thereof. This argument is grounded on the fact that the union is, by law, the bargaining agent for all employees—those who do not belong to the union as well as those who do. 29 U.S. C.A. § 159. This argument may be answered by reference to the section of the Constitution under consideration. Clearly, it is the intent of this section to leave as a matter for *individual determination and preference* the question of whether the worker will derive any benefit from association with a labor union. The choice is his to make. Presumably, the appellants in the instant case have decided that union membership is not an overall benefit to them personally, else they

would have joined." *Schermerhorn, supra* 141 So.2d at *272–273*.

In Amalgamated Ass'n v. Las Vegas-Tonopah-Reno Stage Line, 202 F.Supp. 726 (D.C.Nev.1962) [affirmed 9 Cir., 319 F.2d 783 (1963)], the United States District Court held that an agency-shop provision whereby an employee, as a condition of continued employment, was required to pay to the union a sum of money equivalent to an initiation fee and periodic payments in lieu of union dues, was illegal under the Nevada Right to Work Law [NRS 613.-250], which provides, in pertinent part:

"No person shall be denied the opportunity to obtain or retain employment because of *nonmembership* in a labor organization. . . ." [Emphasis added.]

The Federal District Court applied the Nevada Right to Work Law to the facts before it, and stated, in *Amalgamated Ass'n, supra* 202 F.Supp. at page *735–736*:

"Again, we are faced with a situation where, if we were to construe the statute literally, we could not say that Nevada has prohibited the agency-shop agreement. But, as is the practice of the federal courts . . . the Supreme Court of Nevada has held that where the literal interpretation would lead to an absurd result or defeat the clear purpose of the lawmakers, we are not to be bound thereby.

"There are two main reasons why we are of the opinion that the lawmakers here, the voters, intended to prohibit the agency-shop as well as the union shop.

"First. It is clear, from our previous analysis, that, under the Taft-Hartley Act, the only obligation of an employee, who is covered by a union-shop agreement, is to pay an initiation fee and dues. That duty, we have noted, is the same duty as is incumbent upon an employee who is bound by an agency-shop agreement. Thus, there is no meaning-

ful distinction between the two types of union-security provisions under the Taft-Hartley Act. It would have been an idle act for the people to prohibit only compulsory union membership, for if the agency-shop agreement were left valid, the employees would be in the same position he was in before the right-to-work law was passed. We cannot assume that the voters were aiming only at the form of the evil they saw, but did not, at the same time, intend to eliminate its substance."

It is apparent that those States which have right-to-work laws similar to the North Dakota Right to Work Law have uniformly held that such laws prohibit agency-shop contracts.

The only authority to the contrary is Meade Electric Company v. Hagberg, 129 Ind.App. 631, 159 N.E.2d 408, 411 (1959), which case involved the question of whether an agency shop was permissible under the Indiana Right to Work Law [Acts of 1957, Chap. 19, Sec. 1; Burns' § 40–2701, C.P.S.], which provided, in pertinent part:

"Public policy. It is hereby declared to be the public policy of the State of Indiana that membership or non-membership in a labor organization should not be made a condition to the right to work or to become an employee of or to continue in the employment of any employer . . . . ."

The Indiana law provided a criminal penalty for violation of its provisions.

In Meade, the company contended that since there was no difference between the payment of dues and actual membership in a labor organization, the agency-shop provision was unlawful. The Indiana Appellate Court disagreed with the company's contention, and concluded that the agency shop was not prohibited by the Indiana Right to Work Law. The rationale of this decision is that the Indiana Right to Work Law was penal in nature. The Indi-

ana Court stated, in Meade, supra 159 N.E.2d, at pages 412–413:

"The above-quoted Right to Work Law contains a penalty provision. The law is well settled that penal statutes will be strictly construed, and not construed to include anything beyond its letter, though within its spirit, and it cannot be enlarged by construction, implication or intendment beyond the fair meaning of the language used. [Citations omitted.] And where the language of a statute is clear and unambiguous, it must be held to mean what it plainly expresses.

. . .

" . . . The Indiana Right to Work Law is plain and unambiguous, and there is no prohibition against the requirement of the payment of fees or charges to a labor organization. The Indiana law merely prohibits agreements and conduct which conditions employment on membership in a labor organization."

The Indiana Right to Work Law was repealed in 1965 and since that time Indiana has not enacted any right-to-work legislation. Thus, the Meade decision has no effect on the instant case.

In the light of the rationale of the decisions interpreting the Right to Work Laws of Arizona, Kansas, Florida, and Nevada, we will now determine whether the agency-shop provision in the instant case is prohibited by the North Dakota Right to Work Law, § 34–01–14, N.D.C.C., which provides:

"Right to work not to be abridged by membership or nonmembership in labor union.—The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization, and all contracts in negation or abrogation of such rights are hereby declared to be invalid, void and unenforceable."

This court has established guidelines to be followed when legislation is construed.

Those guidelines are set forth in the following cases, which we believe are applicable in the instant case:

In Monson v. Nelson, 145 N.W.2d 892, 898 (N.D.1966), this court said:

"The question of statutory construction resolves itself to one of ascertaining and giving effect to the legislative intention. That intention must be sought, first, in the language of the statute, and if that language is ambiguous or of doubtful meaning, then resort may be had to certain extrinsic aids."

In State v. Weigel, 165 N.W.2d 695, 697–698 (N.D.1969), this court stated:

"In construing legislation generally it is our duty to attempt to determine legislative intent, and when that intent is directed toward an objective not prohibited by the state or federal constitutions, our construction of the legislation should be in aid of and compatible with this intent."

In State v. General Insurance Company of America, 179 N.W.2d 123 (N.D.1970), in paragraph 1 of the syllabus, we held:

"The code establishes the law of this state respecting the subjects to which it relates and its provisions and all proceedings under it are to be construed liberally, with a view to effecting its objects and to promoting justice."

■ Finally, in the case of In re H., 206 N.W.2d 871 (N.D.1973), this court held, in paragraph 3 of the syllabus:

"In pursuance of the general object of giving effect to the intention of the legislature, the courts are not controlled by the literal meaning of the language of the statute, but the spirit or intention of the law prevails over the letter thereof. Effect will be given the real intention even though contrary to the letter of the law."

■ In order to determine the spirit or intention of the North Dakota Right to Work Law, we will first look to the public policy in the labor relations area as adopted by the North Dakota Legislature and the people of the State. In Minor v. Building and Construction Trades Council, 75 N.W.2d 139, 148–149 (N.D.1956), such public policy was determined by this court to be as follows:

"In that area [labor relations] our pioneers early recognized the necessity of giving labor some protection in its economic contest for a living. Sec. 23 of the North Dakota Constitution provides:

'Every citizen of this state shall be free to obtain employment wherever possible, and any person, corporation, or agent thereof, maliciously interfering or hindering in any way, any citizen from obtaining or enjoying employment already obtained, from any other corporation or person, shall be deemed guilty of a misdemeanor.'

"Later when industrial troubles arose in the east, the North Dakota legislature passed Chapter 247, 1935 S.L. granting preventive relief in labor disputes. This act has been amended and re-enacted, appearing now as Chapter 34–08, NDRC 1943, with some amendments in the 1949 and 1953 Supplements. The policy of this state in regard to those laws is set out in Sec. 34–0802, NDRC 1943 [34–08–02, N.D.C.C.]:

'For the purpose of the interpretation of the provisions of this chapter, the public policy of this state is declared to be that a worker of this state shall be free to decline to associate with his fellows, but that he also shall have full freedom of association, self organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free in such matters, as well as in other concerted activities for the purposes of collective bargaining or other mutual aid or protection, from interference,

restraint, or coercion by employers of labor or their agents.'

The statutes enacted to carry out this policy must be interpreted in harmony with the policy declared by the legislature.

"In furtherance of the policy so adopted the legislature has enacted the following statutes:

"Sec. 34–0901, NDRC 1943, 1949 Suppl. [§ 34–09–01, N.D.C.C.] provides that:

'The public policy of this state is declared to be that a worker shall be free to decline to associate with his fellows and shall be free to obtain employment wherever possible without interference or being hindered in any way, but that he shall also have the right to association and organization with his fellow employees and designation of representatives of his own choosing.'

"Sec. 34–0114, NDRC 1953 Suppl., Approved on Referendum June 29, 1948 [§ 34–01–14, N.D.C.C.], provides that:

'No person shall be deprived of life, liberty or property without due process of law. The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization, and all contracts in negation or abrogation of such rights are hereby declared to be invalid, void and unenforceable.'

"It is clear that the legislature of North Dakota adopted for the state a public policy of protecting the worker in his right to work free of any interference and control by either employers or labor organizations. He has a right to join his fellows in organization for the betterment of his condition and to choose his own representatives for that purpose. He also has the right to decline to join any organization and to obtain and retain employment wherever he chooses."

Thus, in North Dakota, prior to the enactment of our Right to Work Law, it had been firmly established as a principle of public policy that a person has a right to work free of any interference, restraint or coercion by either employer or labor organizations. We assume that the legislature had this public policy in mind when it enacted our Right to Work Law [Brenna v. Hjelle, 161 N.W.2d 356, 359 (N.D. 1968)], and that such law was enacted in furtherance of the public policy so adopted.

We believe that if we were to construe § 34–01–14, N.D.C.C., literally, such a construction would defeat the purpose of the legislature in enacting § 34–01–14, because a person's right to work could still be restrained under an agency-shop clause which requires an employee to pay union dues as a condition to continuing employment.

In addition, we agree with the reasoning of the United States Supreme Court in the *General Motors* and *Schermerhorn* cases, *supra*, when such Court held that an agency-shop provision which required employees to pay union fees as a condition to employment was the "practical equivalent" of an "agreement requiring membership in a labor organization as a condition of employment".

We also adopt the rationale of the Arizona Superior Court in *Arizona Flame, supra*; the Kansas Supreme Court in *Higgins, supra*; the Florida Supreme Court in *Schermerhorn, supra*; and the Nevada Federal District Court in *Amalgamated, Ass'n, supra*, when those courts held that agency shops are prohibited by Right to Work Laws similar to the North Dakota Right to Work Law.

In an Annotation entitled "Validity and construction of 'right-to-work' laws", found at 92 A.L.R.2d 598, the authors of A.L.R.2d analyze the cases discussed *supra* dealing with the Right to Work Laws of

Arizona, Florida, Kansas, Nevada, and Indiana, and conclude, 92 A.L.R.2d at page 619:

"§ 13. *Contractual provisions and agreements covered.*

.    .    .    .    .    .

"[b] *Agency shop agreements.*

"Where a right-to-work law contains no specific prohibition against payment of money to a labor organization in lieu of membership therein as a condition of employment, the courts are often called upon to rule as to the legality of the so-called 'agency-shop' agreement, and it has been generally held that the spirit, if not the letter, of the law, makes this form of union security unlawful."

The Union argues that we should give weight to the construction placed upon the North Dakota Right to Work Law by the North Dakota Attorneys General.

In Walker v. Weilenman, 143 N. W.2d 689 (N.D.1966), at paragraph 1 of the syllabus, we held:

"Where an Act of the Legislature is ambiguous, the courts will give weight to the practical and contemporaneous construction placed upon it by the Attorney General and the officers charged with its administration."

While we agree that the opinions of the Attorneys General should be given careful consideration, they are not binding on this court (7 Am.Jur.2d, Attorney General § 8), and when we determine that they do not present a sound construction of the statute, it is our duty to deviate from them and apply a better-reasoned construction.

In the instant case, we believe that Judge Redetzke afforded proper weight to the opinions of the Attorneys General, and, since his decision is unreported, we will quote from it in pertinent part:

"The defendant union also relies on a series of opinions of the Attorney General of the State of North Dakota (Defendants' Exhibit C). An analysis of these opinions definitely reveals that the Attorney General was far from certain, accurate or consistent in his interpretations of the existing law on the subject. The initial opinion of July 8, 1952 takes the position that the agency shop arrangement is not dependent on membership or nonmembership in a union. The Supreme Court of the United States, as hereinbefore indicated, has subsequently ruled to the contrary. Secondly, the opinion is prefaced on the fact that the nonunion employee enters into the arrangement of his own free will. Under the union contract here involved this is not true, since the nonunion employee must submit to the deduction of union dues from his salary or suffer the loss of his employment.

"In the opinion of August 24th, 1959, the Attorney General relies on the Indiana case of Meade Electric Co. vs. Hagberg (1959) 129-Ind.App. 631, 159 NE 2d 408, hereinbefore referred to. As indicated above, this is an isolated, contrary opinion which subsequent opinions have refused to follow. In his opinion of May 7, 1962 the Attorney General had to acknowledge the uniform disagreement of subsequent authority with the decision of the Meade case, however the Attorney General steadfastly adhered to his former opinion in the following words:

'At this time we do not feel that it would be fitting or proper to change our position on this matter without a directive from the Legislature or the courts. While there is at present a division of authority on this question, most of the authority taking a viewpoint contrary to the position taken by this office has come about after we issued our initial view on this agency shop question."

"In the opinion of February 18th, 1966, the Attorney General made a modification of his original opinion by at-

tempting to distinguish between the use by the union of the money deducted from the nonunion member's paycheck for costs of bargaining purposes as distinguished from the union's other expenses. The language is as follows:

'If the employees have selected a bargaining representative, it is our opinion that you have authority to withhold an amount from each employee's pay check sufficient to cover the costs incurred by the bargaining agent which were necessary to properly represent all the employees. Our office cannot determine this amount. It would be your duty to make certain only bargaining costs are deducted from employees' pay checks, unless the employee authorizes you to deduct a larger amount. Failure to limit the deduction to this sum would amount to an abridgement of the employee's rights set forth in the above quoted laws. You, of course, have authority as Commissioner to refuse to deduct any such amounts from employees' pay checks. The bargaining agent would then have the responsibility of collecting from the employees.'

"Apparently the Attorney General had found it necessary to come to this conclusion by reason of the decisions since 1959 on the right to work law as related to the union or shop agency arrangement.

"It will be noted that the union contract herein, Plaintiff's Exhibit 1 contains no provision restricting the use by the union of the money deducted from the nonunion member's pay check. On the other hand, the distinction made by the Attorney General was effectively obliterated by the Supreme Court in Retail Clerks Local 1625 v. Schermerhorn, 373 U.S. 746; 10 L.Ed. 678, 682–684; 83 S. Ct. 1461. . . .

.   .   .   .   .   .

"Finally, in his opinion of January 9, 1964, the Attorney General left the problem to the courts for decision by saying:

'We are aware that the U. S. Supreme Court has said that a provision conditioning employment upon the payment of sums equal to initiation fees and monthly dues is the "practical equivalent" of an agreement requiring membership in a labor organization as a condition of employment. This office has not sanctioned such a stringent union-security arrangement.

'While our position is certainly not free from doubt, we feel that the best course of action for those persons who wish to have our view changed would be to pursue appropriate court action or seek changes in the statute at the forthcoming legislative session.'

"So far as this Court is concerned, the issue has been presented and for the reasons herein given it has been resolved."

Accordingly, we hold that the North Dakota Right to Work Law prohibits the denial of a person's right to work because of an agency-shop provision which requires the payment of monthly dues to a labor organization, and which therefore imposes the practical equivalent of compulsory membership in such labor organization as a condition of continued employment. Thus, the agency-shop provision and the requirement of the dues "checkoff" for nonunion employees in the labor contract involved in the instant case are illegal, void, and unenforceable.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and TEIGEN and KNUDSON, JJ., concur.

VOGEL, Judge (dissenting).

I dissent.

The majority opinion relies most heavily on four decisions from other jurisdictions,

but gives short shrift to events closer to home which I consider more persuasive and pertinent to us—the repeated holding by the Attorney General and the Commissioner of Labor of this State for 21 years that the agency shop is permitted under the North Dakota right-to-work law, Section 34–01–14, N.D.C.C.

That statute was passed by the Legislature in 1947 and was approved upon referendum on June 29, 1948. On July 8, 1952, on January 13, 1956, and on August 24, 1959, the Attorney General of this State ruled that an agency shop, such as is involved in the action now before us, is not prohibited by Section 34–01–14. These opinions were directed to the Commissioner of Labor. These opinions have been reiterated by the Attorney General twice since then, after inquiries by legislators, on May 7, 1962, and on January 9, 1964.

Since the first opinion was promulgated on July 8, 1952, eleven legislative sessions have come and gone, and the Legislature has done nothing to change the law. We have often held that we will give deferential weight to the practical and contemporaneous construction of a statute by the Attorney General and administrative officials of this State. State v. Gronlie and State v. Heck, 213 N.W.2d 874 (N.D.1973). Additional weight is given where the construction has been impliedly approved by the Legislature. Horst v. Guy (2d case), 219 N.W.2d 153 (N.D.1974); Walker v. Weilenman, 143 N.W.2d 689 (N.D.1966); State v. Equitable Life Assurance Society, 68 N.D. 641, 282 N.W. 411 (1938). In the latter case, we said:

". . . The special form provided by the several commissioners of insurance for their own convenience in computing the amount of this tax in no case made reference to premiums upon annuity contracts until the amended form was submitted by the then commissioner in 1936. And in that year, when the question arose as to whether such annuity premiums were taxable, the attorney general of the state of North Dakota in a written opinion ruled that they were not. Thus it appears that at all times prior to 1936 the departmental construction was that premiums taken for annuity contracts were not within the contemplation of the legislature when it used the words 'gross premiums' in section 4924. In the meantime, different legislative assemblies had enacted legislation dealing with questions of insurance and of taxation, but no amendment was made of this statute. This is pertinent in determining the legislative intent. The 'Legislature is presumed to know the construction of its statutes by the executive departments of the state.' [Citation omitted.] And if that construction is erroneous it can correct the error. We think that under the circumstances as disclosed in the instant case the construction placed upon section 4924, supra, by the insurance department is entitled to great weight in resolving the question of construction now before us and would be determinative were we in doubt in this matter. While it is true that the rulings of executive officers who have practically construed a law are not conclusive, nevertheless 'the ruling of an executive officer upon a point where it is his sworn duty to act, especially where the rulings have been acquiesced in by those whose financial interests were involved, are always given considerable weight in the courts, and when the power is doubtful the uniform rulings in an executive office would be followed, and allowed to turn the scale. Cooley, Const. Lim. (3d Ed.) marg. pages 69, 70.'" [Citations omitted.]

On this ground alone, I believe that the judgment of the trial court should be reversed.

Turning now to the case law of other jurisdictions (which is entitled to respectful examination but is not conclusive), I note that the United States Supreme Court cases do not assist us in deciding the effect of the right-to-work law on agency shop

, 72 N.E.2d 662.

contracts but leave that question open to our interpretation. They construe Sections 8(a)(3) and 14(b) of the Taft-Hartley Act, and merely hold that the States can outlaw an agency shop, not that a right-to-work law actually does so.

The opinions from other States are, of course, entitled to respect and they can be persuasive, but they can persuade only on the basis of their reason and logic, since they have no value to us as binding precedent. On the basis of the reasonableness of their arguments, I find little to choose between the portions of the opinions of the courts in the Kansas and the Florida decisions and the decisions of the lower Federal courts as to the Nevada law (all cited in the majority opinion) on the one hand, and the opinion of the Indiana court on the other hand. Portions of the Kansas and Florida opinions are quoted in the majority opinion, as are the Federal court interpretations of the Nevada law. A pertinent quotation from the Indiana decision, holding that the Indiana law did not forbid the agency shop, is as follows:

"Certainly, apart from specific, unambiguous language of the Indiana Right to Work Law, which does not specifically prohibit the payment of dues, fees and charges, because of the fact that there are the two types of statutes in the states of this country dealing with such legislation, which states had passed such laws prior to the time the Indiana law was enacted, it would seem that the clear, unequivocal language of the Indiana act was intended to apply to union membership and not to outlaw 'agency shop' agreements which provide for the payment of fees and dues to labor organizations properly designated as collective bargaining representatives. Had the legislature intended to make such provisions and such conduct illegal it should have so expressly declared in the language of the act. Carnegie-Illinois Steel Corp. v. Review Bd. of Indiana Employment Security Division, et al., 1947, 117 Ind.App. 379, 72 N.E.2d 662. From an examination of the provisions of the plain, unequivocal language of the Indiana Right to Work Law and the provisions contained in Article VI of the agreement in question we cannot conclude that such provisions providing for the so-called agency shop agreement are illegal under the Indiana Right to Work Law." Meade Electric Co. v. Hagberg, 129 Ind. App. 631, 159 N.E.2d 408 (1959).

The same could be said of the North Dakota Act. The plain language of the statute includes the word "membership" and does not forbid a deduction in lieu of dues. The Legislature could have forbidden such deductions easily, had it chosen to do so, either at the session when the law was passed or at any of the eleven sessions since the Attorney General construed the law to allow the agency shop. As mentioned in the majority opinion, twelve States do specifically prohibit in their right-to-work statutes the payment of dues, fees, or other charges to a union as a condition of employment. The North Dakota statute does not contain such a prohibition.

Although the majority opinion relies upon the decision of the Arizona court in Baldwin v. Arizona Flame Restaurant, Inc., 82 Ariz. 385, 313 P.2d 759 (1957), the question with which we are faced was not decided there. It ruled only that a so-called one-owner clause (which would have required any co-owner to pay union dues) violated "the basic and fundamental right of free men to be self-employed without undue hindrance and interference" and went on to say, "This conclusion makes it unnecessary to rule on the legality of any of the four clauses when tested under the right-to-work amendment, supra." Thus the quotation from the opinion contained in the majority opinion here is dictum.

I find nothing in the case law to persuade me that we should disregard the continuous interpretation of our statute by the Attorney General and administrative officials of this State.

I could stop here, but I am troubled by some of the rhetoric in the cases which the majority opinion cites with approval. I therefore add a few comments.

First of all, a deduction for the amount equivalent to dues is not the "practical equivalent" for all purposes of membership in a labor union. The first *Schermerhorn* case in the United States Supreme Court [373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963)] does not so hold. It merely says that such deductions are the equivalent to membership so far as the provisions of Section 14(b) of the Taft-Hartley Act are concerned.

Second, as a practical matter, the deduction of an amount equal to union dues is not the "practical equivalent" of union membership. Union membership involves a great deal more. Even at the monetary level, it means payment of initiation fees, which are sometimes substantial and burdensome, and it may mean the payment of special assessments for strikes, death benefits, and other purposes. The contract with which we are concerned requires only the payment of an amount equal to dues, not initiation fees or assessments. [In that respect this case differs from the cases in all the States whose statutes are construed in the decisions relied upon by the majority —Arizona, Kansas, Florida, and Nevada. We could therefore distinguish the present case on this ground alone.]

On other levels, union membership requires many things not required of non-members, including submission to internal disciplinary proceedings, participation in strikes if called, picket duty, and perhaps attendance at the meetings, and service on committees or as officers. The difference between all the burdens of membership and mere payment of an amount equal to dues is great, and it is not unreasonable to assume that the North Dakota Legislature knew and understood the difference in drafting the statute.

Third, the language of some of the cases relied upon by the majority [including our own Minor v. Building and Construction Trades Council, 75 N.W.2d 139 (N.D. 1956)] suggesting that public policy requires that employees be "free of any interference and control by either employers or labor organizations" is simply unrealistic in equating a worker's relationship with his fellow employees and his relationship with his employer. In the vast majority of cases, his interests are identical with those of his fellow employees in matters relating to wages, hours, and working conditions (i. e., the matters subject to collective bargaining in most cases); while in the vast majority of cases they are different from his employer's interests in the same matters. To equate union and employer in this context is uncomfortably redolent of discredited decisions such as Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923), overruled by West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), which pretended that individual women could bargain with great corporations on equal terms, and which are reminiscent of the comment of Anatole France in "Le Lys Rouge" (1894): "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread."

Fourth (if we are to go into the merits of the right-to-work Act, as some of the cases relied upon by the majority do), it is plain that the members of the union at the Fargo Foundry (97 of the 100 employees in the bargaining unit) have much to be said for their point of view. The Indiana court, at least, recognized this fact. Our State law, Chapter 34–12, N.D.C.C., requires the State Commissioner of Labor (in appropriate cases) to determine the bargaining unit for purposes of collective bargaining. Section 34–12–05 requires that the bargaining representatives "be exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment." Therefore, the dues-paying members, by law, must repre-

sent the non-dues-payers whether they like to or not. They have no right to refuse to represent the free riders. We are not asked here to determine whether the union members have a constitutional right not to have *their* money used for the purpose of aiding those who choose not to join, but if we were so asked, what could we say—if we follow the majority opinion? Are not the dues-paying members being penalized because of their membership in a union? Actually, the practical effect of a combination of a right-to-work law and a labor law which requires union members to represent nonmembers who do not contribute to the cost of representation, which compels the bargaining unit to represent *all* employees, is to discourage union membership, to give a free ride to those who choose not to join the union, and to weaken collective bargaining. The 97 employees whose bargaining has presumably raised the wages and bettered the working conditions of the three plaintiffs, have much reason to complain if they cannot even collect a proportionate share of the cost of representation from the three free riders.

I would reverse.