In re Nelson Grant HALLAHAN,
d/b/a Nelson Hallahan &
Associates, Debtor.

N.I.S. CORPORATION and Ozark
National Life Insurance
Company, Plaintiffs,

v.

Nelson Grant HALLAHAN, Defendant.

Bankruptcy No. 185–00458.
Adv. No. 185–0148.

United States Bankruptcy Court,
C.D. Illinois.

May 22, 1989.

Nile J. Williamson, Peoria, Ill., for debtor.

Mark G. Zellmer, St. Louis, Mo., for plaintiffs.

## OPINION

WILLIAM V. ALTENBERGER,
Bankruptcy Judge.

This matter came on before the Court for trial on the dates of December 5, 1988, and December 6, 1988, on the issue of damages. Prior thereto, on October 16, 1987, this Court had granted partial summary judgment in favor of the Plaintiffs, N.I.S. Corporation and Ozark National Life Insurance Company (OZARK), on the issue of whether Hallahan's sales of Connecticut Mutual policies to Ozark policy holders were willful and malicious within the meaning of Section 523(a)(6) of the Bankruptcy Code.[1] In so ordering this Court stated:

> N.I.S. must prove that it suffered injury as a result of Hallahan's actions. It will not be sufficient to show that the percentage of lapsed policies of OZARK policyholders which Hallahan had contacted, sold, serviced and otherwise dealt with significantly exceeded the percentage of lapsed policies for the company as a whole. N.I.S. must show that, but for Hallahan's contacts with the OZARK policyholders, the policies would not have lapsed.[2]

---

1. The facts of this case and the procedural history are fully set forth in this Court's prior decision at 78 B.R. 547 (Bkrtcy.C.D.Ill.1987) and will not be restated here.

2. In denying the Plaintiffs' motion for partial reconsideration of this order, this Court acknowledged the difficulties in proving damages in actions for breach of contracts not to compete. *See Matter of Isbell,* 27 B.R. 926 (1983).

The following pertinent evidence was introduced at trial. During the year prior to Hallahan's termination in December, 1983, he serviced approximately 950 Ozark policyholders. Subsequent to his termination, he sold Connecticut Mutual policies to approximately 245 OZARK policyholders who cancelled their OZARK policies. In most of these instances, the purchase of the Connecticut Mutual policies occurred within one or two months of the cancellation of the OZARK policies.

William Buchanan, a consulting actuary, testified for the Plaintiffs. Buchanan graduated from Drake University with a degree in actuarial science. He is a fellow of the Society of Actuaries, a fellow of the Congress of Actuaries in Public Practice, a charter member of the American Academy of Actuaries, and is enrolled with the Internal Revenue Service.

Furnished with a list of those OZARK policyholders who had replaced their policies with ones issued by Connecticut Mutual, Buchanan determined that the present value of the loss of profits from those policies was $208,111.28. In arriving at that calculation, Buchanan considered the actual provisions of the policies; the ages of the policyholders; the costs associated with administering the policies, including premium taxes and commissions; mortality rates and any reinsurance. Buchanan assumed an interest rate of 8½% and utilized lapse ratios from Linton Tables B and C. Buchanan testified that the interest rate of 8½% was considerably below that currently available to the Plaintiffs for new investments. He referred to an annual statement of the Plaintiffs' earnings which reported an overall yield of 8.51%. Buchanan stated that the lapse ratios used were comparative to the Plaintiffs' historical rates.

In addition to presenting proof of compensatory damages, Mr. Zellmer, attorney for the Plaintiffs, testified that his attorneys fees incurred in representing the Plaintiffs are $76,000.00. At the close of the Plaintiffs' case, Hallahan made a motion for judgment in his favor which was taken under advisement.

Herbert L. Cohen, a general agent for Connecticut Mutual in the Peoria area, testified for Hallahan. He testified that Hallahan has worked for him for a period of five years. As a result of their employment arrangement, Hallahan's sales of Connecticut Mutual policies generate income for Cohen. Cohen admitted that his agency received income from Hallahan's sales of $29,000.00 in 1988 and $31,750.00 in 1987.

Although Cohen did not make his own computation of damages, he challenged that made by Buchanan. Cohen was critical of the assumptions utilized by Buchanan, faulting both the interest rate and the lapse ratios. He stated that he did not believe that they accurately reflected the true conditions of the insurance industry during that period. Cohen referred to A.M. Best's Insurance Reports for 1988, which state that the ordinary lapse ratio for OZARK Life was 19.9% and the net yield on investment assets was 7.63%. He also testified that during the years 1983 through 1985, the lapse ratio was significantly higher because of high interest rates and that the whole insurance industry suffered substantial losses. It was during this period that the insurance industry began to develop new products such as universal life policies and current assumption life, which were "interest sensitive." Cohen stated that many companies had wholesale replacements of their inforce business. He noted that his agency faired rather well during this crisis, however, stating that its lapse rates were lower than the average rate for Connecticut Mutual.

Cohen characterized Hallahan as a high-producer. While in terms of numbers Hallahan had more policies which lapsed, he also sold a greater number of policies. He stated that in his opinion, the lapse ratio of an inactive agent is two to three times as high as that of an active agent. Cohen also stated that in his opinion, the interest rate of 8½% which Buchanan assumed in

While declining to advise the Plaintiffs how to present their case, this Court did note that it would not be necessary for the Plaintiffs to present every policyholder at trial.

his calculation was too high, according to historical averages.

At the close of all evidence, the Court heard oral arguments and the matter was taken under advisement. Written briefs were submitted by the parties.

■ The Plaintiffs contend that both the number of OZARK policy terminations and the close proximity within which the Connecticut Mutual applications were made establish that the OZARK policy terminations would not have occurred but for Hallahan's wrongful solicitations. This Court agrees. The correlation is clear. Of the 245 replaced policies, over 200 were cancelled and replaced by Connecticut Mutual policies within a three month period. This, when viewed in connection with Hallahan's unusually high lapse ratio of over 50% during 1984, establishes the requisite causal connection.

Hallahan suggests that the picture painted by the Plaintiffs is incomplete. Pointing to the absence of evidence of the amount of insurance which did not lapse, Hallahan contends that any calculation of damages is speculative. Presumably what Hallahan seeks is to offset the loss of profits on terminated policies by income which has been received or may yet be received on policies which are still in force.

Hallahan is not entitled to any offset, however. Prior to the termination of Hallahan's employment with the Plaintiffs, the Plaintiffs were entitled to receive all premiums on the policies written by Hallahan, from which Hallahan would receive a specified share, based upon the agency contract. The fact that the Plaintiffs were wrongfully deprived of receiving premiums on the replaced policies has nothing to do with their right to receive premiums on the policies which remain in force.

■ Prior to Hallahan's bankruptcy in June, 1985, the Plaintiffs had filed a complaint for permanent and preliminary injunction and application for temporary restraining order. By agreement of the parties, a preliminary injunction was issued enjoining Hallahan from contacting or soliciting OZARK policyholders. Hallahan argues that because the Plaintiffs first sought equitable relief in the form of a temporary injunction in federal district court proceedings, they are barred from seeking legal relief here. A court may retain jurisdiction to entertain the issue of damages, after disposition of an issue of injunctive relief. *Dinoffria v. International Brotherhood,* 331 Ill.App. 129, 72 N.E.2d 635 (2d Dist.1947). Here, the Plaintiffs' complaint for permanent and preliminary injunction had not yet been adjudicated at the time Hallahan filed his petition in bankruptcy. Later, in early 1988, long after this adversary proceeding was filed, the proceeding was dismissed without prejudice by stipulation of the parties. Therefore, the doctrines of *res judicata* and collateral estoppel have no application. *See In re Piper Aircraft Distribution System Antitrust Litigation,* 551 F.2d 213 (8th Cir.1977). Moreover, Section Twenty-one of the agency contract, governing the covenant not to compete provides:

Agent agrees that, in the event of a breach of this Section, damages to Company would be difficult or impossible to ascertain, such breach would lead to a multiplicity of actions and Company would suffer irreparable harm and would be without an adequate remedy at law. Accordingly, Company shall be entitled to obtain a temporary restraining order, temporary injunction and permanent injunction enjoining and prohibiting violation of the provisions of this section, and Company shall have such other relief as may be provided in law or in equity together with such actual and punitive damages as may be provided by law or equity. Agent hereby waives any requirement for the securing or posting of any bond by Company in connection with the obtaining of any temporary restraining order or injunction or other equitable relief.

Having determined that the Plaintiffs established the requisite causal connection, this Court turns to the evidence introduced on the amount of the damages. Hallahan faults the calculation of damages by Buchanan in two respects. First, Hallahan contends that his actual lapse ratio should

be factored in, rather than the industry rates as evidenced by the Linton Tables.

While complete information is not available from the record, it appears that Hallahan's lapse ratios have fluctuated significantly over the years, as follows:

| Year | Company | Lapse Ratio |
|------|---------|-------------|
| 1979 | Ozark | 15.86% |
| 1980 & 1981 | Ozark | 32.16% |
| 1982 | Ozark | 14.52% |
| 1983 | Ozark | 20.50% |
| 1984 | Ozark | 51.90% |
| 1/85—3/85 | Ozark | 5.72% |

The overall lapse rate for Connecticut Mutual for the first nine months of 1985 was 10.9%. The lapse rate for the Peoria area was 7.4%. Cohen testified that Hallahan's lapse ratio was average for the company.

During the first two time periods shown above, the number of policies serviced by Hallahan was relatively small, being 169 in 1979 and 350 during the two-year period of 1980 and 1981. In each of the years from 1982 through 1984, Hallahan serviced approximately 900 policies. However, it was in late 1983 when Hallahan began selling Connecticut Mutual policies and contacting OZARK policyholders. For these reasons, several of the years listed above cannot fairly be considered. In this Court's view, the remaining periods simply do not provide a sufficiently reliable base to determine an average. This is precisely the advantage of the Linton Tables, which were developed from historical compilations. Moreover, this Court fails to perceive why Hallahan's personal lapse ratio should be applied after his termination. Had the OZARK policyholders continued their insurance, they would have been serviced by a different OZARK agent. Perhaps Hallahan's higher lapse ratio resulted in part from his inattention to current policyholders in his zeal to sell a greater number of policies.

Hallahan also contends that the lapse rates used by Buchanan did not reflect economic conditions of the time. Even accepting Cohen's testimony that the insurance industry as a whole experienced disastrous losses due to massive product replacements, this Court cannot assume that, absent Hallahan's interference, OZARK policyholders would not have replaced their existing policies with other OZARK products. Buchanan testified that he used the Linton B and C Tables which were comparable to prior lapse rates experienced by the company. Again, application of the Linton Tables eliminates the need to consider sharp fluctuations—either high or low—in policy terminations. The projection of lost profits spans a thirty-year period. It would not be just or fair to calculate the amount of damages with tunnel vision, considering only present economic conditions. And, while it is true that Buchanan had been regularly employed by the Plaintiffs in the past, he was no longer in their employ at the time of trial. This Court accepts his testimony.

Next, Hallahan contends that the interest rate of 8½% which Buchanan assumed was too high. In support of his contention, Hallahan relies upon a report of A.M. Best which shows an overall earnings rate for the Plaintiffs for 1988 of 7.63%. As noted by the Plaintiffs, however, this rate may well reflect a lower earning on older investments which would detract from a higher rate earned on new investments.

Any overestimate in this rate is counterbalanced by the Plaintiffs' approach to damages in this case. As this Court noted in its prior order of March 9, 1988, damages are difficult to prove in these types of cases and need not be proven to a mathematical certainty. The Plaintiffs only seek damages for those OZARK policyholders who actually purchased Connecticut Mutual policies from Hallahan. It is indeed likely that there are former OZARK policyholders who were contacted by Hallahan about Connecticut Mutual policies and terminated their OZARK policies as a result of that contact but did not purchase Connecticut Mutual policies. As the Plaintiffs postulate, the policyholders who retain their OZARK policies may have a lower lapse rate than the average because they may be unable to replace their insurance due to their age or a medical condition.

Taking these factors into consideration, this Court believes that the projections and calculations of Plaintiffs' expert have a ra-

tional basis. Accordingly, this Court finds that the Plaintiffs are entitled to damages in the amount of $208,111.28.

■ In addition to compensatory damages, the Plaintiffs claim that they are entitled to punitive damages. This Court, in *In re Hulvey*, Adv. No. 87–8275 (May 24, 1988) (unpublished), held that an award of punitive damages is dischargeable. In so holding, this Court followed the decision of Judge Gerald Fines in *In re Rubitschung*, 101 B.R. 28 (Bkrtcy.C.D.Ill.1988), which relied upon *Matter of Suter*, 59 B.R. 944 (Bkrtcy.N.D.Ill.1986). In *Suter*, Judge Ginsberg held that an award of treble damages under RICO were punitive in nature and therefore dischargeable as not being obtained by actual fraud as required by Section 523(a)(2)(A). Judge Ginsberg continued:

> The result reached by this Court also accords with other provisions of the Bankruptcy Code, particularly Section 523(a)(7). Section 523(a)(7) provides for the nondischargeability of a debt owed to a governmental unit for a fine, penalty, or forfeiture that is not compensation for any actual damages. In Section 523(a)(7), Congress created a specific exception to discharge for noncompensatory damages. However, Congress clearly determined to not allow nongovernmental entities to seek the nondischargeability of punitive damages under Section 523(a)(7). The language of Sections 523(a)(2)(A) and 523(a)(7) when read in harmony compel the conclusion that Congress intended noncompensatory damages to be excepted from discharge only where they are owed to a governmental entity pursuant to Section 523(a)(7). No other result can be gleaned from interpreting the plain language of those sections.

> Finally it must be remembered that Section 523(a)(2)(A) is a provision conflicting with the fresh start philosophy of the Bankruptcy Code. Therefore, it should be read no more broadly than required to implement the policy underlying Section 523(a)(2)(A), i.e. the policy against debtors avoiding fraud-based debts in bankruptcy. If McCullough collects $14,045.51 plus interest and attorneys' fees from the debtor, he will be made whole. If he collects $56,935.62, he will, in effect, receive a windfall in the amount of $35,748.97. The Bankruptcy Code intends the former result. It does not intend the latter. Section 523(a)(7) recognizes that debtors are to be punished by governmental units in (and after) bankruptcy cases, not by creditors. (Footnote omitted) (Citation omitted).

This Court concurs with Judge Ginsberg's analysis. The Plaintiffs are not entitled to an award of punitive damages.

■ The Plaintiffs also request attorney's fees in the amount of $76,000.00, representing the total amount of fees incurred by the Plaintiffs, including representation in federal district court litigation. Section Fifteen of the agency contract between the parties provides, in part:

> Agent shall pay all expenses including attorneys' fees incurred by Company in any suit, action or proceeding in which Company establishes a breach of this Contract by Agent.

The issue of whether a creditor is entitled to an award of attorney's fees in a dischargeability proceeding is disputed.[3] Judge Larry Lessen, the Chief Bankruptcy Judge for this District, addressed the issue in *In re Sain*, 101 B.R. 30 (Bkrtcy.C. D.Ill.1988). Concluding that such an award is discretionary, he stated:

> The Bank seeks judgment for its attorneys' fees in this proceeding, relying on a doctrine referred to as the "American Rule." That doctrine limits allowance of attorneys' fees in cases involving federal law to those in which there exists a statutory basis, a basis created by instru-

---

**3.** *See In re Martin,* 761 F.2d 1163 (6th Cir.1985) (creditor entitled to attorney's fees where provided for in note in Section 523(a)(2)(B) action); *In re Foster,* 38 B.R. 639 (Bkrtcy.M.D.Tenn. 1984); *compare In re Penney,* 76 B.R. 160 (Bkrtcy.N.D.Cal.1987) (provision in note providing for attorney's fees irrelevant); *In re Senty,* 42 B.R. 456 (Bkrtcy.S.D.N.Y.1984).

ment which is the basis for relief in the case, or aggravated conduct situations justifying imposition of fees for equitable reasons. *In re Woods*, 25 B.R. 16, 17 (Bankr.D.Oregon 1982). The Bank contends that because the form note the Debtor signed contains a provision wherein the Borrower agrees to pay attorneys' fees as part of costs of collection, the Bank is entitled to attorneys' fees. The Court finds that the award of attorneys' fees in a bankruptcy proceeding to determine dischargeability of a debt is beyond the scope of the provision contained in the note. The Court further finds that the award of attorneys' fees to a prevailing creditor in such a proceeding is within the Court's discretion, and is the exception rather than the rule.

This Court is in agreement with *Sain* and holds that in this case, the Plaintiffs are entitled to an award of attorney's fees. Hallahan, an experienced insurance salesman, solicited the many OZARK policyholders with full knowledge that his actions were in violation of the covenant not to compete. Hallahan continued to solicit OZARK policyholders even after consenting to the issuance of the temporary injunction. At trial, the Plaintiffs' attorney testified that fees had been incurred in the amount of $76,000.00. His conclusory statements are not sufficient for this Court to make findings necessary to approve a fee request. Accordingly, Plaintiffs' attorney is directed to file an affidavit within twenty (20) days detailing time spent and expenses incurred. Hallahan shall then have twenty (20) days within which to object.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in an Opinion entered on the 22nd day of May, 1989;

IT IS, THEREFORE, ORDERED as follows:

1. That Hallahan's motion for judgment at the close of the Plaintiffs' case is DENIED.

2. That the Complaint for Nondischargeability is ALLOWED and the debt is nondischargeable in the amount of $208,111.28.

3. Plaintiffs' attorney shall file an affidavit within twenty (20) days detailing time spent and expenses incurred. Hallahan shall then have twenty (20) days within which to object.